UNITED STATES ex rel. ANDERSON v. HOWE.

(District Court, S. D. New York. March 31, 1916.)

1. CITIZENS ⬤⇒13—EXPATRIATION—RIGHT TO CHANGE ALLEGIANCE.

A citizen may throw off his allegiance to this country if he desires, especially in view of Rev. St. § 1999 (Comp. St. 1913, § 3955), declaring that the right of expatriation is a natural and inherent right of all people.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ⬤⇒13.]

2. CITIZENS ⬤⇒13—EXPATRIATION—RESIDENCE IN FOREIGN COUNTRY.

Mere residence in a foreign country, even by a naturalized American, has no effect upon such person's citizenship.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ⬤⇒13.]

3. CITIZENS ⬤⇒13—EXPATRIATION—STATUTORY PROVISIONS.

Act March 2, 1907, c. 2534, § 2, 34 Stat. 1228 (Comp. St. 1913, § 3959), provides that when any naturalized citizen shall have resided for two years in the foreign state from which he came it shall be presumed that he has ceased to be an American citizen, provided that such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States. *Held*, that it was within the power of Congress to lay down this rule even as applied to a naturalized citizen who had left the United States for the land of his birth before the act was passed.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ⬤⇒13.]

4. CITIZENS ⬤⇒13—EXPATRIATION—STATUTORY PROVISIONS.

Act March 2, 1907, § 2, providing that when any naturalized citizen shall have resided for two years in the foreign state from which ·he came it shall be presumed that he has ceased to be an American citizen, provided that such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer, does not refer only to the status of naturalized citizens while abroad, but applies when a naturalized, citizen, after living abroad for the statutory period, returns to the United States; and, when such a person presents himself for admission to the country, the presumption is that he is no longer an American citizen, especially in view of the Naturalization Convention of 1869 with Sweden, providing that a naturalized citizen renewing his residence in Sweden without intent to return to America shall be held by the government of the United States to have renounced his American citizenship, and that the intent not to return may be held to exist when a person so naturalized resides more than two years in Sweden.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ⬤⇒13.]

5. CITIZENS ⬤⇒13—EXPATRIATION—STATUTORY PROVISIONS.

The presumption, under Act March 2, 1907, § 2, that a naturalized citizen residing for two years in the foreign state from which he came has ceased to be American citizen, is rebuttable.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ⬤⇒13.]

6. TREATIES ⬤⇒6—ABROGATION.

The Naturalization Convention of 1869 with Sweden and Norway is now in force notwithstanding the separation of those kingdoms in 1905.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 6; Dec. Dig. ⬤⇒6.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. TREATIES ☞11—OPERATION AND EFFECT.

The admission of aliens and the regulation of citizenship, as distinct from alienage, is peculiarly a matter of national concern, and, as to such matters, treaties are the supreme law of the land.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 11; Dec. Dig. ☞11.]

· Habeas corpus by the United States, on the relation of Carl Edward Anderson, against Frederick C. Howe, Commissioner, etc. On hearing. Writ discharged, and relator remanded.

Anderson is a Swede, who came to the United States in 1891, and appears to have remained here continuously until 1906. He left a wife and children in Sweden and never brought them to America. In 1905 he was duly naturalized, and in the year following returned to Sweden. There is no disinterested evidence as to his intent to remain or return at the time of his departure from the United States. He did continuously remain in Sweden, tilling a farm which he held under a 20-year lease, and owning the house wherein he lived upon said farm, and also paying taxes, until 1915, during which time he took no steps to register himself as an American citizen with any diplomatic or consular officer of this country. He did not bring with him on returning to America any member of his family. The farm he left in charge of his children. On arrival in New York the immigration authorities found him insane, also nearly penniless, and, so far as discoverable, without relatives or friends in this country. After detention at Ellis Island for a considerable time, he so far recovered his sanity as to testify before a board of special inquiry and substantially admitted the truth of all the foregoing facts, adding, however (in substance), that it had been his intention on returning to the United States to ultimately bring his family with him because he was "scared by the war." He denied any intention of abandoning his American citizenship and asserted that he had always had an intention to return at some time.

Having been held as an alien of the prohibited classes and ordered deported by the Secretary of Labor, this writ was taken.

Olav J. Schultz de Brun, for relator.
Harold A. Content, Asst. U. S. Atty., opposed.

HOUGH, District Judge. The questions raised by this proceeding are whether under section 2 of the Act of March 2, 1907 (U. S. Comp. Stat. § 3959), or under the treaty between the United States and Sweden and Norway of May 26, 1869 (Malloy's Treaties, Conventions, etc., between United States and other powers, vol. 2, pp. 1758–1761), Anderson is after more than ten years' residence in Sweden an alien or a citizen. The question of expatriation—the question whether one gains or loses citizenship by residence in or away from a country—is one that has been discussed as long as courts in the United States have spoken.

[1, 2] There is no doubt that a man may throw off his allegiance if he desires, and the right so to do is declared to be a natural and inherent one by U. S. Rev. Stat. § 1999 (Comp. St. 1913, § 3955), which statute is no more than the legislative expression of the doctrine laid down by Marshall, C. J., in The Venus, 8 Cranch, at 280, 3 L. Ed. 553. On the other hand it has been held with almost complete uniformity that mere residence in a foreign country, even by a naturalized American, has no effect upon such person's citizenship. Young v. Peck, 21 Wend. (N. Y.) 389; Peck v. Young, 26 Wend. (N. Y.) 613.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

See, also, Ware v. Wisner (C. C.) 50 Fed. 310; State v. Adams, 45 Iowa, 99, 24 Am. Rep. 760; and Brown v. United States, 5 Ct. Cl. (U. S.) 571.

When the law was in such a state as to hold that a man could change his citizenship or allegiance at will, and yet foreign residence no matter how long continued did not per se affect the status of citizenship, the matter was certainly ripe for a statutory rule as to the inference of intent to be drawn from such residence, intent being pre-eminently a matter as to which presumptions are needed if any certainty is to be introduced into decisions.

Accordingly, the Act of June 29, 1906, c. 3592, § 15, 34 Stat. 601 (U. S. Comp. Stat. § 4374), makes a return to the native country of a naturalized citizen under certain circumstances "prima facie evidence of a lack of intention on the part of such alien" to become a citizen and lays him open to petition to set aside his certificate.

The Act of 1907 is upon its face in pari materia, for it declares that, when any "naturalized citizen shall have resided for two years in the foreign state from which he came," it shall be presumed that he has ceased to be an American citizen.

[3] Since the decision of the Supreme Court in Mackenzie v. Hare, 239 U. S. 299, 36 Sup. Ct. 106, 60 L. Ed. ——, discussion is useless as to the power of Congress to lay down this rule. The third section of the act under consideration relates to the effect of marriage with a foreigner upon an American woman. Mrs. Mackenzie was native born and had always resided in California. She there married a resident unnaturalized Englishman and was thereupon treated as an alien by the election authorities of that state. The case upholds their ruling, and it seems to need no argument that, if Congress by statute can attach the consequence of alienage to the marriage of a native born with a resident alien, it can entail the same consequences upon the long-continued nonresidence of a naturalized citizen.[1]

This decision also does away with all arguments that might have been founded upon the fact that the act was passed after Anderson left the United States for Sweden, for if the statute may conclusively hold a female citizen to have elected alienage by marriage, it is obvious that it may also hold a nonresident naturalized citizen to have elected alienage by his nonresidence. If there is no deprivation of liberty or property by one act under the statute, there is none by the other.

This is thought to be the first litigation of its kind under this statute, although the law has been upon the books for upwards of eight years. This is because of an opinion of the Attorney General rendered in 1910, and found in volume 28 of Opinions, at page 504.

[4] By referring to the history of the act as it passed through the Houses of Congress, and depending for interpretation upon the speeches of members, the conclusion was reached that the statute referred

---

[1] It cannot be said that Mackenzie v. Hare is but the recognition of an old common-law rule. It is thought that the statute (so far as considered in the decision) is no more than a statutory affirmance of the common law; but the court's opinion rests upon the statute and not on tradition.

only to the status of naturalized citizens abroad "when the conditions are apparently such as to indicate that they have no bona fide intention to return and reside in the United States. When a citizen returns to the United States the necessity for such protection no longer exists, and it is fair to assume that with the cessation of the necessity the presumption created by the act also ceases."

There is no such limitation in the act itself and no obscurity in the language of the section in question. The same style of interpretation was urged upon the Supreme Court in the Mackenzie Case and there rejected, and the action of the Department of Labor in respect of Anderson is the result of a belief that the Attorney General's opinion has been overruled by the decision of the Supreme Court. I share that view.

It follows that by force of the statute Anderson lately presented himself at the door of this country with a statutory presumption against him that he had ceased to be an American citizen by reason of his long-continued residence in the land of his birth.

[5] I think this is a rebuttable presumption, but am clearly of opinion that there is nothing in the evidence to sustain the rebutter. It follows that Anderson is an alien, and as such plainly to be excluded upon the facts duly found and shown in the return to the writ.

[6] While the statute is sufficient to dispose of this case, the treaty obligations between Sweden and the United States are likewise worthy of consideration. By the Naturalization Convention of 1869, supra, it was agreed that:

"If a Swede or Norwegian who has become a naturalized citizen of the United States renews his residence in Sweden or Norway without the intent to return to America, he shall be held by the government of the United States to have renounced his American citizenship. The intent not to return to America may be held to exist when a person so naturalized resides more than two years in Sweden or Norway."

It is said that this treaty is not now in force because of the separation between those kingdoms which occurred in 1905. This is wholly erroneous. The collection of treaties above referred to is official, having been compiled under a resolution of the Senate of January 18, 1909, and the documents which continued in force as to each kingdom, the treaties made by the United Kingdom, may be seen as to Norway at page 1300, and as to Sweden at page 1724 of volume 2 of Malloy's compendium.

[7] Thus the treaty raises the same kind of presumption as does the statute. It is, however, further urged that, upon the construction of the statute contended for by the relator and justified by the opinion of the Attorney General, the act of Congress overrides the treaty. As above set forth, I cannot agree with this interpretation of the act; but, even if it were otherwise, the admission of aliens and the regulation of citizenship as distinct from alienage is peculiarly a matter of national concern. As to such matters there can be no doubt that treaties are the supreme law of the land, a subject treated of with great force in the address of Hon. F. B. Kellogg before the American Bar Association in 1913 (A. B. A. Reports, vol. 38).

The writ is discharged, and the relator remanded.