### MILLER, Alien Property Custodian, et al. v. SINJEN.

(Circuit Court of Appeals, Eighth Circuit. April 23, 1923.)

No. 6169.

1. **Citizens ⬅10—Presumption of law of citizenship by naturalized citizens rebuttable.**

Under Act March 2, 1907, § 2 (Comp. St. § 3959), providing that, when any naturalized citizen shall have resided for two years in the foreign state from which he came, it shall be presumed that he ceased to be an American citizen, *held* that, if such act applies to the case of a naturalized citizen who returned to his native country and resided there more than two years and thereafter returned to the United States, such presumption in any event is rebuttable.

2. **Citizens ⬅10—Evidence held to rebut presumption of law of citizenship by residence abroad.**

In proceedings by a naturalized citizen to recover from the Alien Property Custodian property seized under claim that plaintiff had forfeited his citizenship by returning to the country from which he came and residing there more than two years, evidence *held* sufficient to rebut the presumption of abandonment of citizenship under Act March 2, 1907, § 2 (Comp. St. § 3959).

3. **Citizens ⬅10—Burden on naturalized citizen to show no abandonment of citizenship by return to land of nativity and residence there.**

In proceedings by a naturalized citizen to recover from Alien Property Custodian property seized under Trading With the Enemy Act, § 9, as amended, where it was claimed that such naturalized citizen under Act March 2, 1907, § 2 (Comp. St. § 3959), had ceased to be an American citizen by returning to Germany, the country from which he came, and residing therein for two years, *held*, that the burden was on the plaintiff to prove that during his stay in Germany he had the intention of retaining his American citizenship on return to the United States and of remaining there permanently.

4. **Citizens ⬅13—Finding of State Department, denying passport, that naturalized citizen had abandoned American citizenship, not binding on courts.**

The finding of the State Department, in refusing a passport to a naturalized citizen who had returned to Germany, his native land, and resided there for a number of years, that such person had not overcome the presumption of abandonment of his American citizenship, created by Act March 2, 1907, § 2 (Comp. St. § 3959), is not conclusive on the courts, since such finding was not necessary to the denial of a passport, and the only evidence on which the ruling was made was by affidavits.

5. **Citizens ⬅10—Granting of passport discretionary, and not evidence of citizenship.**

The granting of a passport by the United States is a discretionary matter, and a passport, when granted, is not conclusive, nor is it even evidence that the person to whom it is granted is a citizen of the United States.

Appeal from the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Suit in equity by Heinrich Sinjen against Thomas W. Miller, as Alien Property Custodian, and others, to recover property seized by the Custodian during the war with Germany. Decree for plaintiff (281 Fed. 889), and defendants appeal. Affirmed.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Dean Hill Stanley, Sp. Asst. Atty. Gen. (James C. Kinsler, U. S. Atty., of Omaha, Neb., and Adna R. Johnson, Jr., Sp. Asst. Atty. Gen., on the brief), for appellants.

Arthur F. Mullen, of Omaha, Neb. (Edwin C. Boehler, of Omaha, Neb., on the brief), for appellee.

Before LEWIS, Circuit Judge, and TRIEBER and BOOTH, District Judges.

BOOTH, District Judge. This is a suit in equity brought by appellee (hereinafter called plaintiff) to recover property owned by him which was seized by the Alien Property Custodian during the war with Germany, and while appellee was living in that country. The property was seized by virtue of the provisions of the Trading with the Enemy Act of October 6, 1917. 40 Stat. 411, c. 106, as amended by Act March 28, 1918, 40 Stat. 459, c. 28, and Act Nov. 4, 1918, 40 Stat. 1020, c. 201, and Act July 11, 1919, 41 Stat. 35, c. 6, and Act June 5, 1920, 41 Stat. 977, c. 241.

The constitutionality of the act has been upheld. Stoehr v. Wallace, 255 U. S. 239, 41 Sup. Ct. 293, 65 L. Ed. 604. No question is raised as to the regularity or validity of the seizure.

Authority to maintain the suit is claimed by virtue of subsection (c), subsection (b), and subdivisions 1 and 8 thereof, and subsection (a), all of section 9 of the act as amended June 5, 1920 (41 Stat. 977, c. 241). Those subsections, in so far as material, read as follows:

"(c) Any person whose property the President is authorized to return under the provisions of subsection (b) hereof may file notice of claim for the return of such property, as provided in subsection (a) hereof, and thereafter may make application to the President for allowance of such claim and/or may institute suit in equity to recover such property, as provided in said subsection, and with like effect. The President or the court, as the case may be, may make the same determinations with respect to citizenship and other relevant facts that the President is authorized to make under the provisions of subsection (b) hereof."

"(b) In respect of all money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, if the President shall determine that the owner thereof at the time such money or other property was required to be so conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or at the time when it was voluntarily delivered to him or was seized by him was—

"(1) A citizen or subject of any nation or state or free city other than Germany or Austria or Hungary or Austria-Hungary, and is at the time of the return of such money or other property hereunder a citizen or subject of any such nation or state or free city. * * *

"(8) * * * Then the President without any application being made therefor, may order the payment, conveyance, transfer, assignment, or delivery of such money or other property held by the Alien Property Custodian or by the Treasurer of the United States, or of the interest therein to which the President shall determine such person entitled, either to the said owner or to the person by whom said property was conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian. * * *"

"(a) * * * Claimant may, at any time before the expiration of six months after the end of the war institute a suit in equity in the Supreme Court of the District of Columbia or in the District Court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian

or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or of the interest therein to which the court shall determine said claimant is entitled. * * *"

As applied to the plaintiff's case, the substance of those provisions is that if he was a citizen of the United States at the time his property was seized, and at the time of the suit brought to recover the same, then he can maintain the suit; otherwise his property must be held by the Alien Property Custodian, and disposed of under section 12 of the act "as Congress shall direct."

The vital question in the case, therefore, is whether plaintiff was at the times mentioned a citizen of the United States. The facts disclosed by the evidence are largely undisputed, and are as follows:

Plaintiff was born in Krakau, Germany, June 24, 1857. He came, with his wife, to the United States in December, 1885. In March, 1887, they settled on a farm in Franklin county, Neb. He made application for citizenship and became a naturalized citizen February 28, 1893. Plaintiff and his wife continued to live in Franklin county, Neb., until 1901, when they returned to Germany for the benefit of Mrs. Sinjen's health. She recovered her health, but they continued to stay in Germany on account of the illness of her father, who was upwards of 70 years of age. The mother was also living. Mrs. Sinjen helped to take care of them. Plaintiff had left his brother-in-law, Emil Sindt, in charge of his farm in Nebraska, and received remittances from him while in Germany of about $1,500 a year, being about one-half of the income from the property. No definite contract was made by Sindt for the care of the property, as he testifies, because he understood plaintiff would be gone only a year or two. In 1903 plaintiff bought a house and about seven acres of land in Germany, and he and his wife, and his wife's father and mother, lived there together. The wife's father owned a farm in Germany, but rented it to one of his sons. The father-in-law died in 1906.

In September, 1908, plaintiff and his wife returned to Nebraska. Plaintiff at this time talked to his brother-in-law about going to California to settle and live. In the latter part of 1908 word came that the mother-in-law in Germany was ill. Thereupon plaintiff and his wife returned to Germany, in February, 1909. The mother-in-law died in April, 1909. After her death the farm which her husband had owned went to one of his sons. Plaintiff's wife received a legacy from her father's estate. About six months after the death of the mother-in-law plaintiff began efforts to sell the house and land which he had bought in Germany. He continued his efforts from 1909 to 1914, but was unable to sell the property, and still owns the same. He and his wife continued to remain in Germany. In 1914, after the war broke out, plaintiff applied to the American consul at Kiel for a passport; but this was refused, on the ground that plaintiff could not overcome the presumption of expatriation, which it was claimed had arisen under the Act of March 2, 1907 (34 Stat. 1228). That act, so far as here material, reads as follows:

"Sec. 2. That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state.

"When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years: Provided, however, that such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe: And provided also, that no American citizen shall be allowed to expatriate himself when this country is at war." Comp. St. § 3959.

Plaintiff made no further effort to leave Germany until after the Armistice. In November, 1919, he applied to the Spanish consul at Kiel for a passport to the United States. The application was referred to the American authorities, and the passport was refused on the ground that he "failed to overcome the presumption of expatriation which arose against him in 1909 under the Citizenship Act of March 2, 1907." In 1920 plaintiff renewed his application for a passport through the American Commission at Berlin, and this was also refused by the State Department. After this last refusal, plaintiff applied to a German official and secured a passport to Holland. The passport was viséed there by the Mexican consul, and plaintiff proceeded to Mexico. In Mexico he was referred by some German official to the American consul. Plaintiff made application for a passport to the United States to the American chargé d'affairs in Mexico City, presenting his citizenship papers and his German passport, and secured the American passport in August, 1921. He returned to Nebraska and commenced the present suit in January, 1922.

While the plaintiff was in Germany he took no active steps to become a German citizen, engaged in no business there, and took no part in the German government or in the war. He was not required by the German authorities to register, and was not questioned as to his citizenship. His property was not placed under supervision. In 1914 or 1915 he bought German bonds, as he explains, because of the popular furore. His brother-in-law in Nebraska, in charge of the property in the United States, reinvested there some $1,500 a year, the balance of the income not remitted to the plaintiff. Amongst other investments he purchased Liberty Bonds. Finally the property was seized by the Alien Property Custodian. Upon the trial plaintiff testified that he at all times considered himself an American citizen, that he never intended to abandon his citizenship, that he never intended to remain permanently in Germany, but at all times had the intention of returning to the United States and remaining there. The evidence shows that some of the statements purporting to have been made by the plaintiff in his application for passports were inconsistent with his testimony given in court, and, in some instances, that his former statements were untrue. In an application in 1919 he stated that he and his wife came to Germany in 1901, but that since then he had "made several trips to America." In 1920 he made affidavit that he and his wife came to Germany in 1901, "as we were both overworked and needed a rest," and that on their return to the United States in

1908 his "wife was again taken ill," and they returned to Germany in 1909. In his application to the American charge d'affaires in Mexico for a passport, it is stated that he had lived in the United States from 1885 to 1901, and from 1904 to 1919, and last left the United States in 1919.

Plaintiff in his testimony denied that he made the last-mentioned statements, but stated that they must have been put in the application by mistake of the party who made it out for him. Emil Sindt, the brother-in-law of the plaintiff, testified that, when plaintiff and his wife went to Germany in 1901, he understood they were going only for a year or two; that when they returned, in 1908, plaintiff talked about going to California to live. Sindt further testified that no specific arrangement was made with him about the care of the property, but that he let it go because plaintiff always said he was coming back, and that no settlement was made in 1908, when plaintiff returned, because he (Sindt) thought they could make the settlement when plaintiff came back again.

On this state of the evidence defendants contended in the court below that the presumption arising under the Act of March 2, 1907, had not been overcome, and that therefore the plaintiff could not maintain the suit. Plaintiff contended that the statute of March 2, 1907, had no application to the case, and further that, even if it had, the evidence overcame the presumption. The trial court held that the Act of March 2, 1907, did apply, citing United States v. Howe (D. C.) 231 Fed. 546, but that the evidence was sufficient to overcome the presumption arising thereunder. A decree was therefore rendered for the plaintiff.

We are strongly impressed with the reasoning and with the conclusion of the Attorney General in 28 Op. Atty. Gen. 504, to the effect that the Act of March 2, 1907, has no application to the case of a naturalized citizen, who, having returned to his native country and resided there more than two years, has thereafter returned to the United States, but that the act is limited to naturalized citizens while residing in foreign countries beyond the period stated in the act. We do not find it necessary, however, to pass upon the question of the proper construction of the act. Section 21 of the Act of March 2, 1907, as added by section 2 of Act March 4, 1923, amending the Trading with the Enemy Act, since this case was submitted, will probably prevent the question from arising hereafter in cases of this kind.

[1] Conceding, but without deciding, that the act does apply to the case at bar, and that the presumption did arise against the plaintiff, yet the presumption was a rebuttable one. U. S. v. Howe, supra; Ex parte Gilroy (D. C.) 257 Fed. 110. Like rulings were made by the Secretaries of State under a similar provision in the treaty of 1868 with Prussia (15 Stat. 615). See Moore's Digest of International Law, §§ 470, 471.

[2] And we are of opinion that the presumption was overcome by the evidence. The period of foreign residence relied upon from which it is claimed the presumption arose was, we assume, the period subsequent to plaintiff's return to Germany in 1909. A two-year period

had not elapsed between the passage of the act in 1907 and the return of plaintiff to the United States in 1908, and the return would stop the running of that period. We mention this because, in one of the letters from the State Department denying plaintiff a passport, a statement is made to the effect that the presumption arose in 1909. This we think was an inadvertence.

[3] The presumption under the statute is not one of renunciation of citizenship. This method of expatriation is covered by the first clause of section 2 of the act of 1907. But the presumption here under discussion is one of abandonment of citizenship, covered by the second clause of the section. It is incumbent on plaintiff to prove, therefore, that during his stay in Germany he had the intention of retaining his American citizenship, of returning to the United States, and of remaining there permanently. Facts and circumstances favorable to plaintiff are that his return to Germany in 1909 was for a specific reason, namely, the illness of his wife's mother; that his property was almost entirely in Nebraska; that he left this property in the care of a brother-in-law, but without specific arrangement as to its care and management; that the brother-in-law believed, from his talk with plaintiff, and acted on the belief, that plaintiff intended to return; that plaintiff had made a trip to Germany in 1901, and had then left his property in charge of the same person and without specific agreement, and had returned to the United States in 1908; that this brother-in-law remitted to plaintiff about one-half of the annual income of the property, and invested the remaining one-half in the United States, amounting to about $1,500 annually; that after the death of the mother-in-law, in 1909, plaintiff endeavored to sell the little property he had in Germany, including the house where he lived; that while in Germany he did not engage in any business; that he made no attempt to take part in German affairs; that he took no steps to become a German citizen, nor made any declaration of intention so to do; that in 1914, again in 1919, and again in 1920, he tried to obtain passports for a return to the United States.

All of these facts and circumstances appear to us to indicate an intention on the part of plaintiff to retain his citizenship and to return to the United States; and when plaintiff's own testimony as to his intention is added to the above facts, we think the only reasonable conclusion is that plaintiff did not intend to cease to be an American citizen, and did not in fact cease to be one. The fact that the record shows that plaintiff may have made statements inconsistent with his present testimony as to some matters, and perhaps may have made untrue statements, is not destructive of the conclusions we have reached above. Those statements were none of them in the nature of declarations or admissions that plaintiff had ceased to be an American citizen, or that he did not intend to return to the United States; in fact, they were all made in his repeated efforts to return to the United States. That the inconsistent and untrue statements have a bearing upon the credibility of the plaintiff is, of course, true; but plaintiff appeared personally in the trial court, he was subject to the observation and examination of the court, and the conclusion of the court was thus expressed:

"Having considered the circumstances in detail, I am convinced that the plaintiff is telling the exact truth, when he swears that he at all times considered himself an American citizen, that he never intended to or did renounce his allegiance to this government, and that his intention to return hither for permanent domicile was fixed and abiding in his mind at all times."

We find nothing in the record that leads us to differ from this conclusion.

It was suggested upon the argument that great weight should be given to the conclusion, reached by the State Department, that plaintiff was not entitled to a passport because he had not overcome the presumption of the Act of March 2, 1907. We have not been unmindful of the suggestion, but have given that conclusion careful consideration. It is to be noted that there was no express finding by the State Department that plaintiff was not an American citizen, but simply a finding that plaintiff had failed to overcome the presumption arising under the statute of March 2, 1907. But, assuming that one is the equivalent of the other, it must be borne in mind that this conclusion of fact by the State Department is not one of that class of conclusions of fact by the head of a department to which is given the force of an adjudication.

It has become established law that Congress may devolve upon an executive department or subordinate official thereof the right and duty of making inquiries of fact and findings thereon, and that such findings are conclusive, if there has been a fair hearing. The right and duty may be devolved by express provision of statute, or as a necessary consequence of the authority granted to the department or official. This rule has been applied to the Land Department, the Navy Department, the Post Office Department, the Department of Agriculture, the Department of Labor and Commerce. Houston v. St. Louis Packing Co., 249 U. S. 479, 39 Sup. Ct. 332, 63 L. Ed. 717, and cases therein cited.

[4] But in all these cases the findings which are held conclusive by the courts are findings which were the necessary basis for the action taken. For example, in the case cited above, a finding that a certain word (sausage) was "deceptive," as a basis for denying its use, when applied to a certain compound of meat, under the Meat Inspection Act; in U. S. v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040, a finding that a certain person was not a native-born citizen, as a basis for denying him admission to the United States under the Chinese exclusion and immigration laws; in Cameron v. U. S., 252 U. S. 450, 40 Sup. Ct. 410, 64 L. Ed. 659, a finding that certain land was "nonmineral" as a basis for denying a patent under the land laws and the Forest Reserve Act and the Monument Reserve Act.

[5] But in the case at bar a finding that plaintiff had ceased to be a citizen of the United States was not necessary to the action of the State Department in denying him a passport, for the reason that the granting of a passport by the United States is, and always has been, a discretionary matter; and a passport, when granted, is not conclusive, nor is it even evidence, that the person to whom it is granted is a citizen of the United States. Urtetiqui v. D'Arcy, 9 Pet. 692, 9 L. Ed. 276; In re Gee Hop (D. C.) 71 Fed. 274; Edsell v. Mark, 179 Fed.

292, 103 C. C. A. 121; 23 Op. Attys. Gen. 509. This has been the law both prior to the passage of any statute relating to the granting of passports, as well as subsequent to such statutes, now embodied in sections 4075 et seq. Revised Statutes (Comp. St. § 7623 et seq.).

Any finding that the State Department may have made in connection with the denial of a passport to plaintiff was purely for the convenience of the department, and does not come within the rule above cited in regard to findings of fact by heads of departments. While such a finding of the State Department is, as above stated, entitled to respectful consideration, it is not binding upon the courts in adjudicating the status of an alleged citizen. Furthermore, evidence before the State Department was solely by affidavit, an unsatisfactory form of evidence at best. On the trial in the court below plaintiff appeared in person and testified. Other testimony was given. The inquiry was broader in scope and also more specific as to details than the inquiry by the State Department.

The conclusion of the trial court that plaintiff was entitled to recover from defendants the property in their custody belonging to him was right, and the judgment is affirmed.