**CAMARDO v. TILLINGHAST, Commissioner of Immigration.**

Circuit Court of Appeals, First Circuit. November 27, 1928.

No. 2249.

William H. Lewis and James Farrell, both of Boston, Mass., for appellant.

John W. Schenck, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is an appeal from the District Court of Massachusetts, dismissing a writ of habeas corpus and remanding the applicant, Antonio Camardo, to the custody of the Commissioner of Immigration for deportation to Italy.

The applicant claims a right of admission to this country as a naturalized citizen of the United States. He arrived at the port of Boston on the steamship Cedric April 4, 1927, and was held by Inspector Collins for examination before the Board of Special Inquiry on the ground that he possessed a fraudulent permit and was applying for admission in violation of the Act of 1924 (43 Stat. at Large, p. 165, § 22 [8 USCA § 220]). On April 7, 1927, a hearing was held before the Board of Special Inquiry, at which time, in answer to questions propounded by the board, the applicant testified that his name was Antonio Camardo; that he was 50 years of age, being born May 17, 1877, at Barranello, Italy, and was coming from there now; that he had a wife and five children in Italy; that in Italy he was a farm laborer, and in the United States a fireman on hoisting machines; that his intention was to go to New York, to his old boss, Mr. Harrison, a contractor at

220 Broadway, New York, and see if he could get a job from him; that he first came to the United States in 1893, and lived here from that time until January 1, 1914; that during that time he was in Auburndale, Sparrows Falls, Troy, and Melrose, New York state; that he took out his first papers to become an American citizen (which papers he presented dated November 12, 1896, from the Oneida County Court), and full citizenship papers at Troy, New York, April 1, 1904; that in January, 1924, he went from his home town in Italy to the American consul in Naples to make application for a passport to come to the United States; that he presented his citizenship papers to the consul, who told him that he would have to refer his case to the State Department in Washington before he would be able to give him an American passport; that later the consul wrote him to forward his citizenship papers, saying that he had received instructions from Washington to issue him a passport; that he forwarded his citizenship certificate to the consul, and a few days later received a letter asking him to sign a receipt, and that he (the consul) would then remit him the money which he had deposited on account of his passport; that he answered that he had no such receipt and requested an explanation; that later he received a receipt, which he signed and sent back, and the consul forwarded him the money he had left on deposit; that he heard nothing more, and did not receive his citizenship certificate back; that on leaving the United States in January, 1914, he went to Italy; that he served in the Italian army during the war, and remained in Italy until he left for the United States on this trip; that in leaving there he went from Naples to Genoa, then to Marseilles, then to Liverpool, where he bought his ticket for passage to Boston; that he had always intended to come back to the United States; that in addition to trying to return to the United States in January, 1924, he, in March, 1927, went to Naples, with the intention of going to the American consul to see what had become of his citizenship papers; that on arrival there he met a man who asked him if he wanted to go to the United States, and, after explaining to him the purpose of his trip to Naples, the man said that it would be no use for him to see the consul; that he would have no show; that if he would pay him a sum of money he would furnish him a permit and passport; that the permit and passport which he possessed were given him on his paying the man 5,000 lire; that all he knew of the man's name was that they called him Giovanni; that his (the applicant's) correct name was Antonio Camardo; that to substantiate this he had a letter of reference from Harrison & Burton Company, consulting and constructing engineers, 220 Broadway, New York, under date September 9, 1913, showing that his name as he was known to them was Tony Camardo; and that he had never been arrested or deported from the United States.

The inquiry having proceeded to this extent, and the applicant having been required to produce the fraudulent permit and passport bearing the name Christini Mattia and bearing Mattia's photograph, without counsel or further inquiry, the board voted to exclude him, and, having done so, addressed him as follows:

"You have been excluded from landing in the United States for the reason that you are coming in violation of the Immigration Act of 1924, in that you are not in possession of an unexpired quota certificate, and that you had in your possession a fraudulent permit and a fraudulent Italian passport. From this decision you have the right to appeal to the Secretary of Labor at Washington. Do you wish to appeal? A. Yes."

April 9, 1927, the record before the Board of Special Inquiry was transmitted to the Secretary of Labor at Washington, and on April 11, 1927, on the recommendation of the Board of Review, the Assistant Secretary of Labor ordered that the exclusion decision of the Board of Special Inquiry be affirmed.

On April 12, 1927, apparently without knowledge of the recommendation of the Board of Review and the order thereon by the Assistant Secretary of Labor, William J. Kelley, attorney at Boston, wrote the Secretary of Labor, through the Commissioner of Immigration at Boston, asking an opportunity to present evidence before the Board of Review before a final decision was made, showing that after Camardo's return to Italy in 1914 he was drafted into the army; that he had a creditable war record; that it was the difficulty in getting back, following the war, that prevented his returning to the United States sooner; and that he had no knowledge of the law barring him after two years. This letter was forwarded to Washington, but as far as the record discloses no consideration was given it.

July 20, 1927, this writ of habeas corpus was brought, and, on October 19, 1927, the case was heard before the District Judge solely on the evidence contained in the immigration record, although a certified copy of the applicant's naturalization on April 1, 1904, in the County Court of Rensselaer County,

New York, a court of record, was offered in evidence and excluded, as well as other evidence on the issue of citizenship. Prior to this hearing William H. Lewis, the attorney at Boston, who brought the habeas corpus petition in behalf of Camardo, had on October 18, 1927, written the Secretary of Labor at Washington, requesting that Camardo's case be reopened for the purpose of submitting additional evidence of his citizenship. This application was denied by the Department of Labor at Washington on October 27, 1927, but Mr. Lewis received no notice of this until December 9, 1927. The District Court having on October 29, 1927, entered an order dismissing the habeas corpus petition and remanding Camardo to the custody of the Immigration Commissioner, Mr. Lewis, in behalf of Camardo, after being notified on December 9th of the decision of the Department of Labor denying his application for the submission of further evidence, on December 14, 1927, filed with the District Court a motion to vacate its decree and for rehearing, on the ground that his application to the Secretary of Labor to reopen the case for the submission of additional evidence had been denied, and this motion was denied by the court.

It is apparent from a reading of the record that the recommendation of the Board of Special Inquiry and the exclusion order of the Assistant Secretary of Labor were based upon the ground that Camardo had in his possession a fraudulent permit and passport, in violation of section 22 of the Immigration Act of May 26, 1924, and that they failed and apparently refused to consider and pass upon the issue of his citizenship, raised by the evidence before them. In so doing the immigration authorities failed in the performance of their duty and rendered the hearing unfair. They should have considered the issue raised by this evidence, and made definite findings and rulings upon it. Tod v. Waldman, 266 U. S. 113, 119, 45 S. Ct. 85, 69 L. Ed. 195. In that case Mrs. Waldman and her children were, after examination, detained for deportation on the ground that they were liable to become public charges, and also because the mother was an illiterate person, unable to read. One of the issues raised by her evidence was that she and her family were seeking admission to the United States to avoid religious persecution in their home in Proskurow; that she escaped from there in 1919, and, after 17 months spent in securing a passport to this country, came here as a refugee; that she and they, as refugees from religious persecution, were exempt by the immigration statute from the operation of the literacy test, but that their claim as such refugees had not been considered by the immigration authorities. It was there said:

"The record is defective also in not showing the definite rulings of the Commissioner or the Board of Inquiry on the issues made by Mrs. Waldman in her evidence. This made clear her claim that she and her children were refugees from religious persecution, relieving her from an educational test; but no finding appears in the record on this point either by the Board or the Department on appeal. The mere implication that the claim must have been passed on adversely to her because the language test was applied is not enough. If the necessary finding was in fact made, it should be made part of the record."

Having reached the conclusion that the hearing before the immigration officials was unfair, in that they had failed to make definite rulings on the issues made by the evidence of the immigrant, the court ordered the case remanded to the immigration authorities to decide the issue or issues thus presented, as they were better qualified to judge such questions, differentiating the case from those where the single question was whether the petitioner was a citizen of the United States before he sought admission, in which the practice is, if the petitioner had not been given a fair hearing, to remand the case to the District Court for decision of such question—citing Chin Yow v. United States, 208 U. S. 8, 13, 28 S. Ct. 201, 52 L. Ed. 369; Kwock Jan Fat v. White, 253 U. S. 454, 40 S. Ct. 566, 64 L. Ed. 1010; Ng Fung Ho v. White, 259 U. S. 276, 42 S. Ct. 492, 66 L. Ed. 938.

It is evident that, if Camardo, as his evidence clearly tended to show, is a citizen of the United States, the fact that he possessed a fraudulent permit and passport would not be ground for refusing him admission to the country, whether his possession of them was or was not a violation of law. U. S. ex rel. Baglivo v. Day (D. C.) 28 F.(2d) 44.

It is contended, however, on the part of the government, that, if Camardo is a naturalized citizen of the United States, the evidence shows that he remained in the country of his nativity for more than two years after his departure from the United States, and that it is to be presumed that he ceased to be an American citizen—relying upon section 2 of chapter 2534 of the Act of March 2, 1907 (34 Stat. p. 1228 [8 USCA §§ 16, 17]), entitled "An act in reference to the expatriation of citizens and their protection abroad." That section provides:

"Sec. 2. That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state.

"When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years: Provided, however, that such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe: And provided also, that no American citizen shall be allowed to expatriate himself when this country is at war."

It is highly doubtful whether the provisions of law contained in the second paragraph of this section have any other or further application than to fix the length of time beyond which this government will not extend protection to its naturalized citizens residing abroad, as the preamble of the act declares.

In 28 Op. Attys. Gen. 507, 508, Attorney General Wickersham said: "The purpose of the act is, I think, simply to relieve the government of the obligation to protect such citizens residing abroad after the limit of two or five years, as the case may be, when their residence there is not shown to be of such a character as to warrant the presumption that they intend to return and reside in the United States and thus bear the burdens as well as enjoy the rights and privileges incident to citizenship."

In Stein v. Fleischmann Co. (D. C.) 237 F. 679, 681, Judge Learned Hand, then District Judge, in passing on this provision of law, held that residence of a naturalized citizen abroad for two or five years, as the case may be, did not affect his status as an American citizen, but, if he wished the protection of the United States after the expiration of such residence abroad, he must satisfy the diplomatic or consular officer of the United States before whom he goes, that he has not reacquired his citizenship in the foreign state; that to hold otherwise would result in modifying existing treaties. He cites the treaty with Austria, which provides in substance that a naturalized citizen of the United States on his return to and residence in Austria, his country of origin, shall not be constrained to resume his former citizenship, but that he may of his own accord reacquire it and no fixed period of residence shall be required.

In Miller v. Sinjen, 289 F. 388, 392, the Circuit Court of Appeals for the Eighth Circuit, in passing upon the question of the applicability of the statute of March 2, 1907, said:

"We are strongly impressed with the reasoning and with the conclusion of the Attorney General in 28 Op. Atty. Gen. 504, to the effect that the Act of March 2, 1907, has no application to the case of a naturalized citizen, who, having returned to his native country and resided there more than two years, has thereafter returned to the United States, but that the act is limited to naturalized citizens while residing in foreign countries beyond the period stated in the act. We do not find it necessary, however, to pass upon the question of the proper construction of the act. Section 21 of the Act of March 2, 1907, as added by section 2 of Act March 4, 1923 [42 Stat. 1516], amending the Trading with the Enemy Act, since this case was submitted, will probably prevent the question from arising hereafter in cases of this kind."

It then assumed for the purposes of the case that the act was applicable and the presumption arose, but held that the presumption was rebuttable and on the evidence was rebutted. It also held that a finding by the State Department "that plaintiff had ceased to be a citizen of the United States was not necessary to the action of the State Department in denying him a passport, for the reason that the granting of a passport by the United States is, and always has been, a discretionary matter, and a passport, when granted, is not conclusive nor is it even evidence, that the person to whom it is granted is a citizen of the United States"; that "any finding that the State Department may have made in connection with the denial of a passport to plaintiff was purely for the convenience of the department, and does not come within the rule above cited in regard to findings of fact by heads of departments."

In United States v. Howe (D. C.) 231 F. 546, Judge Hough, then District Judge, was of the opinion that the statute was applicable to a naturalized citizen, who had resided in Sweden more than two years, and that he presented himself at the door of this country with a statutory presumption against him that he had ceased to be an American citizen by reason of his residence in the land of his birth. But this holding was unnecessary to the decision of the case, as our treaty with Sweden provides that "the intent not to return to America may be held to exist when a

person so naturalized resides more than two years in Sweden or Norway."

The Department of State, in construing section 2, has also ruled that the presumption of cessation of American citizenship, arising under the statute from protracted residence abroad, continues to exist only while a naturalized citizen continues to reside abroad, and that upon his return to the United States with the bona fide intention of making it his permanent residence the presumption disappears. Consular Instruction No. 919 of November 24, 1923.

In view of the language of the preamble of the act, the conflict that would exist between the act and the provisions of some of our treaties with foreign nations, and in view of the opinions expressed by Attorney General Wickersham and the Circuit Court of Appeals of the Eighth Circuit, we think the provisions of section 2 here in question are not applicable to this case. And if there is a presumption that can be erected from the applicant's continued residence abroad which can be invoked in court, it is one "easy to preclude and easy to overcome. It is a matter of option and intention" (United States v. Gay, 264 U. S. 358, 44 S. Ct. 389, 68 L. Ed. 728), and that "mere residence abroad, however long continued, absolves not from allegiance, for that accrues only from new allegiance assumed abroad" (United States v. Eliasen [D. C.] 11 F.[2d] 785, 786).

Then, again, this country on November 12, 1918, exchanged ratifications of a convention between it and Italy, providing for reciprocal military service. In the preamble it states that the President of the United States and the King of Italy, "being convinced that for the better prosecution of the present war it is desirable that the citizens of the United States in Italy and Italian citizens in the United States shall either return to their own country to perform military service in its army or shall serve in the army of the country in which they remain, have resolved to enter into a convention to that end, * * * and have agreed upon and concluded the following articles:

"Article 1. All male citizens of the United States in Italy * * * shall, unless before the time limited by this convention they enlist or enroll in the forces of their own country or return to the United States * * * for the purpose of military service, be subject to military service and entitled to exemption or discharge therefrom under the laws and regulations from time to time in force of the country in which they are. * * *

"Article 5. No citizen of either country who, under the provisions of this convention, enters the military service of the other shall, by reason of such service, be considered, after this convention shall have expired or after his discharge, to have lost his nationality or to be under any allegiance to the United States or to his Majesty the King of Italy, as the case may be."

40 Stat. pp. 1633, 1634, 1635.

By the terms of this convention a naturalized American citizen who, under its provisions for the prosecution of the war, entered the military service of Italy did not lose his nationality or come under any allegiance to the King of Italy after the expiration of the convention or after his discharge.

█ But the questions raised by the applicant's evidence, whether he was a naturalized citizen of the United States, whether a presumption had arisen against his citizenship by reason of his residence in Italy for more than two years, whether his evidence overcame such presumption, if there was one, and whether, having entered the military service of Italy during the war, he had "lost his citizenship by reason of any oath or obligation taken by him for the purpose of entering such service," were not passed upon by the immigration authorities, and no definite rulings of law or fact were made upon them. Such being the situation, the case must be remanded to the District Court for trial, where the parties will be accorded every opportunity to present their evidence and be heard upon the issues raised bearing on the applicant's citizenship.

█ Attention, however, should be called to the fact that the Act of May 9, 1918, chapter 69, paragraph 12, provides:

"Twelfth. That any person who, while a citizen of the United States and during the existing war in Europe, entered the military or naval service of any country at war with a country with which the United States is now at war, who shall be deemed to have lost his citizenship by reason of any oath or obligation taken by him for the purpose of entering such service, may resume his citizenship by taking the oath of allegiance to the United States prescribed by the naturalization law and regulations, and such oath may be taken before any court of the United States or of any state authorized by law to naturalize aliens or before any consul of the United States, and certified copies thereof shall be sent by such court or consul to the Department of State and the Bureau of Naturalization, and the act (Public Fifty-Five, Sixty-Fifth Congress, approved October fifth, nineteen hundred and seventeen), is hereby repealed." 40 Stat. p. 545 (8 USCA § 18).

See, also, 40 Stat. at L. p. 340.

532

This act plainly declares that if the applicant, while a citizen of the United States and at any time during the late war in Europe, entered the military service of Italy and is deemed to have lost his citizenship by reason of any oath or obligation taken by him for the purpose of entering such service, he may resume his citizenship by taking the oath of allegiance to the United States before any court of the United States or of any state authorized by law to naturalize aliens. In case such a state of facts is found to exist the applicant should be accorded the privilege of taking the oath and permitted to enter the country. See In re Grant (D. C.) 289 F. 814, and U. S. ex rel. Baglivo v. Day (D. C.) 28 F.(2d) 44.

The decree of the District Court is vacated, and the case is remanded to that court, for further proceedings not inconsistent with this opinion.