**GO LUN v. NAGLE, Commissioner of Immigration.**

Circuit Court of Appeals, Ninth Circuit.
October 24, 1927.

No. 5146.

**1. Aliens ⬚32(18)—Hearing on application for admission as citizen held unfair, and order of exclusion unwarranted by the evidence.**

On examination of petitioner, a Chinese applicant for entry as son of a citizen and of his father and older brother, each was asked a great number of questions, material and immaterial, as to dates, events, and description of places. On all questions relevant to the claim of citizenship the witnesses agreed, but there was some discrepancy in their recollection of minor and unimportant matters, and on that ground petitioner was excluded. *Held*, that the hearing was manifestly unfair, and the finding against citizenship unwarranted by the evidence.

**2. Aliens ⬚32(1)—Purpose of hearing on application for entry as citizen is to inquire fairly into citizenship.**

The purpose of hearing on application for entry as citizen is to inquire into citizenship, and not to develop discrepancies which may support an order of exclusion.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; George M. Bourquin, Judge.

Petition of Go Lun against John D. Nagle, Commissioner of Immigration for Port of San Francisco, for writ of habeas corpus. From an order denying the petition, petitioner appeals. Reversed, with directions.

George A. McGowan, of San Francisco, Cal., for appellant.

Geo. J. Hatfield, U. S. Atty., and T. J. Sheridan, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. [1] This is an appeal from an order denying a petition for a writ of habeas corpus. The appellant based his right to admission to the United States on the claim of citizenship through his father. The testimony heard before the immigration authorities was given by the appellant, his father, and a prior landed brother, and, as said by the court in Johnson v. Ng Ling Fong (C. C. A.) 17 F.(2d) 11:

"The testimony of the applicant and of his alleged oldest brother and father, given before the immigration authorities, shows that they were interrogated as to substantially every conceivable thing that occurred or would be likely to have occurred during their lives, of which each could be expected to have had any knowledge."

The appellant was asked to describe his father and mother; when his father left China; how often his father had been married; how many brothers he himself had; their names and ages; where they were born; whether they had ever lived in any other village; whether any brothers or sisters had died; whether there were any adopted children; what letters he had written to his father and a prior landed brother; whether he or any of his brothers were married; who defrayed the expenses of his trip from Hong Kong; what photographs had been taken; what he was doing when his brother left China; the name of the school he and his brother had attended; the name of the teacher; when his brother quit school; up to what time his brother had attended school regularly; to make a diagram of the school building; whether there was any place in the school for the pupils to sleep; whether the teacher had a room there; whether there was a parlor, an open hall, or a court in the school building; what windows or skylights were in the building; to describe the scholars who attended the school; whether he knew certain

named parties; where the teacher lived; whether he and his brother had made any trips from the village together; where the markets were; the names of some of the children in the home village with whom he had played; whether there was any incident that his brother should remember; whether the people of his village had any trouble with the people of the neighboring village; where he parted company with his brother when the latter left for the United States; who was present; the time of day; who carried the baggage; how his brother was dressed; of what the baggage consisted; a description of his trunk; the names of his paternal grandparents, and what became of them; whether his father had any brothers or sisters; whether his brother had any family; what dialect his mother spoke; whether the paternal grandfather had brothers or sisters; whether his maternal grandparents were living; whether his mother had any brothers or sisters; of what village his mother was a native; the size of the village; in what direction the village faced; the number of houses owned by his father and where located; how many alleys his alley was from the left; who lived in the first house in the row, and of whom did the family consist; a description of his father's house; a description of a neighboring house; where the water was obtained for the house; the names of the ancestral halls; the names of the alleys in the village; between what alleys the ancestral hall was located; how many alleys were in the Go section of the village, and their names; whether any family, other than the Go family, lived in that section of the village; whether there was a separation or dividing line between the two villages; whether there was a wall on his side of the village; the length of the wall or embankment; whether there were walls on the sides and rear of the village; the number of gates to the village; the signs on the gates; the occupation of his father while living in China; who now lives on the father's farm, and has he a family; how his father cultivated the land; the sleeping arrangements in the house; the markets at which the family traded; whether they crossed bridges or streams going to the market; the number of houses on his alley; the distribution of pork in the village at the festival the last year his brother was at home; where the distribution was made; on what day the distribution took place; whether it was customary to have school on that day; what graves were visited; whether there were any stones over the graves; on what part of the hill his ancestors were buried; who accompanied him to the graves on that occasion; whether his younger brother, then three years of age, walked or was carried; what kind of a day it was; who usually went to market for the family supplies; whether his mother always carried the supplies home herself; whether his mother carried the rice home; whether there were any peddlers in the village, and the names of any such peddlers; whether any articles of European or American make were in the house; whether there was a clock in the house, or pictures on the walls; how the house was lighted; where the lamps were kept in the daytime; where the kerosene supply was kept; in what quantities the oil was bought; how many beds were in the bedroom occupied by his two brothers; a description of the bed or beds; what kind of a bed he himself occupied; what other furniture was in the rooms; where the lamp was placed in the bedroom; how many tables were in the house, and where located; what kind of tables, floors, windows, and skylights; the number of chairs in the house; at what table the family ate; whether there was an inscription over the door on the outside; the color of the outside door; whether the alley was paved in front of the house; and other questions of like import.

The examination of the father and prior landed brother covered pretty much the same ground. The three witnesses were in full accord as to their relationship, the history of the family, the home, and its surroundings, in all the infinite detail above set forth. There were some so-called discrepancies in the testimony, however, and because of these admission was denied, and the excluding decision was affirmed on appeal.

[2] We may say at the outstart that discrepancies in testimony, even as to collateral and immaterial matters, may be such as to raise a doubt as to the credibility of the witnesses and warrant exclusion; but this cannot be said of every discrepancy that may arise. We do not all observe the same things, or recall them in the same way, and an American citizen cannot be excluded, or denied the right of entry, because of immaterial and unimportant discrepancies in testimony covering a multitude of subjects. The purpose of the hearing is to inquire into the citizenship of the applicant, not to develop discrepancies which may support an order of exclusion, regardless of the question of citizenship.

The chairman of the Board of Special Inquiry pointed out a number of discrepancies in the testimony, but the General Board of Review referred to three of these only, saying of the others: "The Board of Special Inquiry

has listed several discrepancies in its summary, which are not sufficiently well developed to determine whether or not they should be given any weight whatever." The three relied upon by the General Board of Review are the following:

First, as to the pavement of the alley in front of the home. In relation to this, the following testimony was given: By the father: "Q. Was your alley paved? A. Yes; it was paved all the way up to my house." By the brother: "Q. Is your alley paved? A. Yes; with stone." By the appellant: "Q. Is there any pavement in front of your house? A. No." It will thus be seen that by design, or otherwise, the questions asked the three witnesses were not the same, and it may well be that the alley was in fact paved with stone, as testified by the brother, and was paved all the way up to the house, as testified by the father, but was not paved in front of the house, as testified by the appellant. Most assuredly, a charge of false swearing or perjury finds no support in such a record.

The next discrepancy relates to certain lands farmed by the father, but here there was in fact no discrepancy at all. In 1923 the father testified that he was engaged in rice farming in China and cultivated some vegetables; that he owned some lands and leased some; that he owned about three shucks, composed of ten different pieces, scattered in different directions in the vicinity of the village; that his sons did not help him farm the land; that he leased the land to Go Dong, and sold the two water buffalo, with which he tilled the land, before leaving China. The brother testified that his father farmed near the home village; that the land was located in different places around the village; that his father owned three or four shucks of land; that it was scattered outside the village; that he never saw it, and did not know the number of parcels; that he saw his father working on one piece of land about 500 feet from the east gate; that he did not assist his father, nor did the appellant; that he was never with the appellant when he saw his father at work on the land, but that quite often he went outside the east gate to call his father to meals when at work on the piece of land nearest the village. The appellant testified that his father farmed in the home village; that he owned a part of the land and leased a part; that he owned three shucks of land; that he did not know where the land was located; that he had never been on the land, and that he learned from his mother that his father owned the three shucks of land. On the present hearing the father further testified that the piece of land nearest the village was about 500 feet away; that this land was about equally distant from either gate; that he could not recall whether any of his sons had seen the land or not; that he worked from one part to another; that his sons were in school, and never assisted him on the farm; and that all of his sons, including the appellant, had called him to his meals from time to time, when he was at work on the place nearest the village.

There is little conflict or discrepancy here. If it be urged that it seems improbable that the appellant should not know the location of the farms cultivated by his father, the same may be said of the brother, whose citizenship is not in question, because he was equally ignorant on that subject. In any event, false swearing and perjury cannot be predicated on a circumstance so trifling.

The third discrepancy related to windows and skylights in the school building, and was even less important than the two already considered. The same may be said of other discrepancies pointed out and referred to by the Board of Special Inquiry.

We fully appreciate the narrow limits of the jurisdiction of the courts on habeas corpus proceedings to review decisions of the immigration tribunals; but "the error of an administrative tribunal may, of course, be so flagrant as to convince a court that the hearing had was not a fair one." Tisi v. Tod, 264 U. S. 131, 44 S. Ct. 260, 68 L. Ed. 590. Such a case is presented here.

A reading of the entire testimony of the three witnesses leaves not the slightest room for doubt that their relationship was fully established, and that the appellant is a citizen of the United States. A contrary conclusion is arbitrary and capricious, and without any support in the testimony.

In Johnson v. Damon (C. C. A.) 16 F.(2d) 65, the court considered discrepancies on which an excluding decision was based, more important than any disclosed by the present record, and in reference to the excluding decision said: "The mind revolts against such methods of dealing with vital human rights." That language might well be applied here. See, also, Ex parte Chung Thet Poy (D. C.) 13 F.(2d) 262, and Johnson v. Ng Ling Fong, supra.

The order of the court below is reversed, with directions to issue the writ of habeas corpus as prayed.