**FONG TAN JEW ex rel. CHIN HONG FUN v. TILLINGHAST, Commissioner of Immigration.**

Circuit Court of Appeals, First Circuit.
March 12, 1928.

No. 2184.

**1. Habeas corpus ⟨⟩113(12)—Appeal from discharge of habeas corpus writ will be considered on question of jurisdiction only, where court discharged writ after only partial hearing of testimony.**

Appeal from discharge of writ of habeas corpus to review exclusion of applicant from United States will be treated as appealed only on question of jurisdiction, where court discharged writ after hearing one witness and partially hearing another, notwithstanding exceptions were saved to refusal to hear further evidence and to discharge of writ.

**2. Aliens ⟨⟩54(17)—Court has no jurisdiction, if any substantial evidence sustains conclusion of immigration officials, excluding alien.**

If there is any substantial evidence to, sustain conclusion of immigration officials, excluding Chinese applicant, court has no jurisdiction.

**3. Aliens ⟨⟩32(9)—Evidence in favor of Chinese boy, seeking admission as foreign-born son of native-born citizen, held to render his exclusion denial of fair and impartial hearing (8 USCA § 6).**

Evidence in favor of Chinese boy, seeking admission under Rev. St. § 1993 (8 USCA § 6), as foreign-born son of native-born citizen, *held* so clear and conclusive that his exclusion by immigration officials constituted denial of fair and impartial hearing.

Appeal from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

Petition for habeas corpus by Fong Tan Jew, on the relation of Chin Hong Fun, against Anna C. M. Tillinghast, Commissioner of Immigration. Decree for respondent, and petitioner appeals. Reversed and remanded for further proceedings.

Joseph F. O'Connell, of Boston, Mass., for appellant.

John W. Schenck, of Boston, Mass. (Frederick H. Tarr, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. In October, 1926, Chin Hong Fun, a boy of 19, sought admission to the United States as the foreign-born son of Chin Lin Teung, deceased, an alleged native-born citizen. R. S. § 1993 (8 USCA § 6). The immigration authorities found the relationship established, the father's citizenship not established, and excluded him, June 11, 1927.

[1] After the issuance of a writ of habeas corpus, but without any return thereon, the District Court (Lowell, J.) set the case for hearing as though jurisdiction were established and the case ripe for a trial on its merits. The fundamental question of jurisdiction seems not to have been considered at all. At any rate, the judge declined to hear the record of the proceedings in the department; on what theory we do not understand. But, after hearing one witness presented by the appellant and partially hearing another, the court abruptly ended the hearing, refused to hear other witnesses present for the applicant, and ruled that the immigration authorities should be sustained. While exceptions were saved to the refusal to hear further evidence and to the discharge of the writ, we think we must treat the case as here only on the familiar question of jurisdiction. Tisi v. Tod, 264 U. S. 131, 44 S. Ct. 260, 68 L. Ed. 590; Kwock Jan Fat v. White, 253 U. S. 454, 40 S. Ct. 566, 64 L. Ed. 1010; Johnson v. Damon (C. C. A.) 16 F.(2d) 65. The partial hearing before the court goes for naught. If the court had jurisdiction, the applicant was entitled to a full trial. Whether there was jurisdiction was not considered and determined.

[2] Before the immigration officials the case was reopened two or three times for further evidence. There was no error or unfairness in admitting or excluding evidence. If there was any substantial evidence to sustain the conclusion that Chin Lin Teung was not born in the United States, the court had no jurisdiction. Johnson v. Damon (C. C. A.) 16 F.(2d) 65 and cases cited; Go Lun v. Nagle (C. C. A.) 22 F.(2d) 246; Chan Sing v. Nagle (C. C. A.) 22 F.(2d) 673.

[3] The applicant contends that the evidence in his favor was so clear and conclusive that the adverse decision is denial of fair and impartial hearing; that it falls under the doctrine thus stated in Tisi v. Tod, 264 U. S. 131, 133, 44 S. Ct. 260, 261, 68 L. Ed. 590: "The error of an administrative tribunal may, of course, be so flagrant as to convince a court that the hearing had was not a fair one."

Cf. Johnson v. Damon (C. C. A.) 16 F. (2d) 65, and Johnson v. Ng Ling Fong (C. C. A.) 17 F.(2d) 11.

In outline the applicant's case was: That his father, Chin Lin Teung, was born at 812 Stockton street, San Francisco, in 1882; that when about 10 years old his parents went to China, leaving him with his cousin

Lew Kim, with whom he lived 6 or 7 years in Fresno, Cal.; that Chin Lin Teung then went back to San Francisco to live and work until, in 1907, he left for China, where he married, had seven children, and died as the result of an accident, in January, 1925, when about to return to the United States with the applicant and one of his brothers.

In effect it is admitted that before Chin Lin Teung left for China in 1907 he filed with the immigration authorities in San Francisco two affidavits—of himself and of his friend Chin Jim—as follows:

"Photo of Chin Lin Teung.
"[Impression Seal.]
"In re Chin Lin Teung, Native-Born Citizen of the United States.
"State of California, County of Alameda—ss.

"Chin Lin Teung, being first duly sworn upon oath, doth depose and say:

"That the photograph hereto attached is the photograph of affiant, and that affiant is a native-born citizen of the United States.

"That affiant is the son of Chin Yen Foon and Jew Shee, and was born in the city and county of San Francisco, state of California, at No. 812 Stockton street (upstairs), during the eighth year of Kwong Suey (1882).

"That affiant has resided in the United States continuously since the time of his birth, but that he is now about to pay a temporary visit to China, intending after a short absence to return to the United States, the land of his nativity, and that he makes this affidavit to facilitate his landing upon his said return.

"[Signed in English] Chin Lin Teung.

"Subscribed and sworn to before me, this 7th day of January, A. D. 1907.

"John W. Gwilt, Notary Public."
"In re Chin Lin Teung, Native-Born Citizen of the United States.
"State of California, County of Alameda —ss.

"Chin Jim (written in English), being first duly sworn upon oath, doth depose and say:

"That affiant is now residing temporarily in the city of Oakland, county of Alameda, state of California.

"That affiant is acquainted with Chin Lin Teung, whose affidavit is annexed hereto, and whose photograph is attached to the said affidavit. That the said Chin Lin Teung is a native-born citizen of the United States.

"That the said Chin Lin Teung is the son of Chin Yen Foon and Jew Shee, and was born in the city and county of San Francis-co, state of California, at No. 812 Stockton street (upstairs), during the 8th year of Kwong Suey (1882).

"That the said Chin Lin Teung has resided in the United States continuously since the time of his birth, but that he is now about to pay a temporary visit to China, intending after a short absence to return to the United States, the land of his nativity, and this affidavit is made to facilitate his landing upon his said return.

"[Signed in English] Chin Jim,"
—and sworn to.

On Chin Lin Teung's affidavit the department stamped:

"Departed from San Francisco per steamer Doric, January 8, 1907."

The document, and photograph duly identified as that of Chin Lin Teung, are now produced from the government files. The duplicate of the photograph, as we understand the record, is produced by the affiant's son, brought with him from China.

These affidavits and photograph are of much legal significance. The affidavits were obviously prepared by Chin Lin Teung and filed with the department, pursuant to instruction from the department, and in accordance with a practice initiated and sanctioned by the immigration authorities, to assist them in the performance of their duties. This practice was a little later formally provided for in rule 39, put out in Bureau Circular No. 25, October 8, 1908, with elaborate provisions for preinvestigation of the claimed status of Chinese persons, departing from the United States. Rule 39 (b), (h), and (j) read:

"(b) Any Chinese person residing in the United States and claiming that, by reason of birth in this country, he is lawfully entitled to so reside in, and to depart from and return to, the United States, who desires to go abroad temporarily, may, in order to avoid delay in securing admission upon return, to one of the ports of entry named in rule 4 of the Chinese Regulations, make written application to the immigration officer located nearest to his place of residence for preinvestigation of his said claim, such application to be prepared in triplicate on Form No. 450, furnished by said immigration officer, and to be filed at least thirty days prior to the date of the proposed departure."

"(h) Upon the arrival of the applicant at the port of departure and the presentation by him of the duplicate of the application, such duplicate shall be placed on file, and the original, with the endorsement of ap-

proval appearing thereon filled out and signed, and with the signature and seal of the officer in charge placed over the margin of the photograph, shall be delivered to the appellant for use upon his return."

"(j) This rule is adopted, in response to a quite general demand, as furnishing a convenient method to be followed by Chinese residents of the United States claiming American citizenship who are desirous of departing from the country with assurance of prompt readmission on return. It is a *privilege* not a *requirement,* and precludes no one from deferring the submission of his proofs and the determination of his claimed status (primarily by an officer in charge at a port and finally on appeal by the Secretary) until application is made for re-entry, nor from leaving the country notwithstanding an adverse decision on an application submitted under this rule and again advancing his claim on returning to a port of the United States, with the privilege of appeal if then rejected."

It is an irresistible inference that Chin Lin Teung was by the immigration officials led to suppose that the filing of these affidavits with his photograph, a copy of which he took with him, gave him a sort of passport for re-entry after his announced *temporary* absence, provided, of course, that investigation (during his absence or on his return) did not discredit his allegation of American citizenship. While this good faith proceeding by Chin Lin Teung did not shift the burden of proof to the government, either for his re-entry or for the admission of his son, it grounds an inference that ought to be met by real evidence, or at least by such discrepancies in the applicant's evidence as to raise serious doubt in impartial minds. Fraud by this dead man and his co-affiant cannot be lightly inferred. The case is, in that aspect, much like Chan Sing v. Nagle, 22 F.(2d) 673, in which the Circuit Court of Appeals for the Ninth Circuit held a return certificate entitled to respect, until overcome by substantial evidence. And the practice indicated by these affidavits clearly contemplated investigation of his status during his "temporary visit to China"; otherwise, the filing of the affidavit would hardly "facilitate his landing upon his said return." Whether there was such investigation during his absence the government has not shown, as apparently it easily could. Under these circumstances, the fair inferences are all in favor of the truth of Chin Lin Teung's claimed status as an American-born citizen.

These two affidavits are evidence of great probative value.

But the applicant's case has much other support. His father's cousin, Lew Kim, testified at length, to the effect that in 1882, when 13 years old, he lived with his uncle at 812 Stockton street, when Chin Lin Teung was born; that his uncle told him of Chin Lin Teung's birth the next morning after it occurred; that about a month later he carried the baby down stairs to the store for the shaving feast; that about 10 years later, while Lew Kim was living in Fresno, he received a letter from his uncle, saying he was going to China; and that after Chin Lin Teung's parents left he took Chin to Fresno to live with him, and kept him for about 7 years. Ng Gow corroborated Lew Kim's testimony, saying he worked in the store at 812 Stockton street; that Lew Kim brought the baby down to the store.

To dispose of this convincing evidence from these two witnesses, the immigration authorities adduce evidence given by Lew Kim in 1915, at Globe, Ariz, when applying for a laborer's return certificate, as follows:

"Q. Have you personal knowledge of the birth of any Chinese children in the United States? A. I know about Gin Hung Yong, son of Gin Ah Quong. He was born in his father's house back of the joss house here in Globe. The boy's mother is Lee Kim Lou, wife of Gin Ah Quong. I know of the birth of a daughter of Fong Kee in Fresno, Cal., a little over seven years ago. Fong Kee is a merchant, proprietor of the Fong Kee store in Fresno. Fong Kee's wife is Thew Ha. The daughter was born in their house at the back of the Fong Kee store. I don't know anything about the birth of any other Chinese children in the United States.

"Q. Then you could not testify in court relative to the birth of any other Chinese children in this country? A. No, because I don't know about any others."

Lew Kim was not confronted with this testimony. But his explanatory affidavit was allowed, and was referred to by the Board of Review as an unsatisfactory and "specious" claim that he understood the questions to apply only to persons then residing in the United States, and that he did not mention Chin Teung because he had gone to China 8 years before. This is certainly an extraordinary way to dispose of the credible and consistent testimony of two witnesses. We think Lew Kim's explanation is reasonable. The question, "Have you personal knowledge of the birth of any Chinese

children in the United States?" needs but the insertion of "now" before "in the United States" to be definitely limited as Lew Kim claims he understood it. Without "now," it is consistent with this Chinese laborer's understanding of it. We cannot regard a finding of deliberate perjury by two witnesses as fairly based on such a flimsy alleged contradiction. Such a result grounds an irresistible inference of straining for an adverse conclusion. Moreover, to hold an uneducated man responsible for an accurate census of all the Chinese babies he had ever known to be born in the United States is to apply an absurd test of credibility.

The applicant testified flatly that his father told him he was born in San Francisco. A newspaper clipping from a Chinese newspaper, describing Chin Lin Teung's death, states he was born in the United States. Lee Doo Pon, laborer from Cambridge, Mass., testified that when in China in 1921 he bought lumber from Chin Lin Teung (who was in the lumber business), and that Chin told him he was born in San Francisco and lived here for 23 or 24 years. There is also corroboration from Fong Tan Jew, a student at the Massachusetts College of Pharmacy and a nephew of Chin Lee Teung's wife.

Another important witness is Yee Cent, of Boston, 68 years old, who testified that he arrived in San Francisco in 1875, when he was 16 years old, and made his headquarters off and on at 812 Stockton street until 1891; that he knows Chin Lin Teung was there born, and that Chin Yee Cent attended the shaving feast and drank so much wine that he had had eye trouble ever since. He is nearly blind, "unable to see to write" his signature, or to recognize it. The Board of Review states that this witness "claimed personal acquaintance with Chin Lin Teung's father and told other details with regard to things that he might be expected to know if his story were true. * * *" But because Yee Cent, in an application for his certificate of residence, made in April, 1894, was *recorded* as stating that he arrived in San Francisco in 1886, the Board of Review ordered the case reopened to admit this certificate and any other appropriate evidence. This was done, and Yee Cent recalled and testified:

"Q. 114. This application which I have shown you, from which it appears the certificate of residence, which you hold, was issued, bears the information that the applicant, Yee Cent, at that time stated he arrived

in the United States on February 29, 1886, at San Francisco, Cal., per steamer Pekin—that year being in Chinese K. S. 12—while you state that you first arrived in the United States in K. S. 1. A. What I gave at the time I applied for my registration certificate is right.

"Q. 115. Do you mean by that you arrived in the United States the first time in K. S. 12, which is the date given on this application for a registration certificate, which you hold? A. Yes.

"Q. 116. Then you could not have been present at the head-shaving feast of Chin Lin Teung in K. S. 8 at San Francisco. Is that right? A. No; I came to the United States in K. S. 1.

"Q. 117. You have already said that the date given on the application for the certificate of residence, which you hold, as to the arrival date in the United States—that is, K. S. 12—was correct. A. No; I came K. S. 1. I don't know what the interpreter said at the time I applied for a certificate of residence.

"Q. 118. Why would you seem to indicate that the interpreter was wrong in the date of arrival, when he is apparently correct in all other facts mentioned in that application? A. At the time of registration, I told Bak Wingk, my witness, who was also the interpreter, my date of arrival, and I don't know what he put down."

The Board of Special Inquiry and the Board of Review held this explanation unsatisfactory; that Yee Cent was "totally discredited"; and thus, in effect, found that Yee Cent was not in the United States in 1882 and did not attend the shaving feast. No attention is paid to Yee Cent's clear evidence that he was 16 when he came here in 1875 and was 68 when he testified; while, if he came in 1886 at the age of 16, he would be only 57. We regard his explanation as credible; there was an obvious error in the record of the department.

The final conclusion of the Board of Review is thus phrased:

"The evidence as to the American birth of Chin Lin Teung is at best weak, and, when it appears that one of the witnesses who has testified to a personal knowledge of his birth in this country is totally discredited, it is not believed that the American birth of Chin Lin Teung is satisfactorily established."

The immigration authorities thus based their conclusion entirely on the argued "discrediting" as described supra, of but two of applicant's witnesses—Lew Kim and Yee

Cent. And their conclusion, stripped of disguising euphemisms, such as "not satisfied," involves a flat finding of deliberate falsification by the dead Chin Lin Teung and his friend Chin Jim in their affidavits of January 7, 1907, as well as gross and detailed perjury by Lew Kim, Ng Gow, and Yee Cent, and at least entire disregard of the evidence of the applicant and Lee Doo Pon that the dead father told them he was born in San Francisco.

Nor is there either evidence or argument as to how Chin Lin Teung could be in San Francisco in 1907 if he was not born there. There is no suggestion that he could, at any unsuggested time, have been legally admitted, or that the inspection system of the department in San Francisco was so loose and inefficient that he was smuggled in, or even that (wherever and whenever born) he was not the son of Chin Yen Foon and Jew Shee, as the affidavits and evidence show. There is nothing whatever to control this mass of credible evidence and the document and photograph stamped by the department when Chin Lin Teung left for China in 1907. There was not a scintilla of evidence that Chin Lin Teung was not born in San Francisco in 1882; there was nothing to control the convincing evidence of such birth. The so-called "discrediting" of but two of several witnesses cannot ground a general finding of widely ramifying perjury, beginning as far back as 1907.

This record shows, as a whole, failure to exercise their great power "under the restraints of the traditions and principles of free government applicable where the fundamental rights of men are involved, regardless of their origin or race." Kwock Jan Fat v. White, 253 U. S. 454, 464, 40 S. Ct. 566, 570 (60 L. Ed. 1010). The conclusion was a fiat—not a finding grounded on substantial evidence, or upon material discrepancies. Chin Yow v. United States, 208 U. S. 8, 28 S. Ct. 201, 52 L. Ed. 369; Go Lun v. Nagle (C. C. A.) 22 F.(2d) 246; United States ex. rel. Leong Ding v. Brough (C. C. A.) 22 F.(2d) 926; Whitfield v. Hanges (C. C. A.) 222 F. 745; In re Chung Thet Poy (D. C.) 13 F.(2d) 262.

The result is that, under the rule laid down in Chin Yow v. United States, 208 U. S. 8, 12, 28 S. Ct. 201, 52 L. Ed. 369, the case must stand for a trial on the merits in the court below.

The decree of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.