## KWOCK JAN FAT *v.* WHITE, AS COMMISSIONER OF IMMIGRATION AT THE PORT OF SAN FRANCISCO.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 313.   Argued April 30, 1920.—Decided June 7, 1920.

Upon a demurrer to a petition for *habeas corpus* alleging unlawful detention under the Chinese Exclusion Laws, the testimony and other papers pertaining to the proceedings of the immigration authorities, when added, by reference, to the petition and filed with it and with the respondent's return, are to be considered in interpreting the allegations of the petition. P. 457.

An adverse decision of the Secretary of Labor upon the identity of a Chinese person, claiming to be an American citizen by birth and as such entitled to reenter the United States, is not conclusive upon the courts if the proceedings were manifestly unfair and if it clearly appear that a fair investigation of his rights was thereby prevented. P. 457 *et seq.*

In such cases, the essentials of the evidence produced before the examining inspector by the person seeking to reenter must be preserved in the record of the proceedings, no less for the information of the Commissioner of Immigration and the Secretary of Labor in exercising

their authority than for the information of the courts in determining whether that authority has been abused.  P. 464.

255 Fed. Rep. 323, reversed.

THE case is stated in the opinion.

*Mr. J. H. Ralston,* with whom *Mr. Dion R. Holm* was on the brief, for petitioner.

*Mr. Assistant Attorney General Stewart* and *Mr. H. S. Ridgely,* for respondent, submitted.

MR. JUSTICE CLARKE delivered the opinion of the court.

In January, 1915, Kwock Jan Fat, the petitioner, intending to leave the United States on a temporary visit to China, filed with the Commissioner of Immigration for the Port of San Francisco an application, as provided for by law, for a "preinvestigation of his claimed status as an American citizen by birth."

He claimed that he was eighteen years of age, was born at Monterey, California, was the son of Ah Tuck Lee, then deceased, who was born in America of Chinese parents and had resided at Monterey for many years; that his mother at the time was living at Monterey; and that there were five children in the family—three girls and two boys.

The Department of Immigration made an elaborate investigation of the case presented by this application, taking the testimony of the petitioner, of his mother, of his brother and one sister and of three white men, of whom the inspector said in his report: "The three white witnesses are representative men of this town and would have no motive in mis-stating the facts."  As a result of this inquiry, the original of his application, approved, signed and sealed by the Commissioner of Immigration at San Francisco, was delivered to the petitioner, and

with this evidence in his possession, which he was amply justified in believing would secure his readmission into the United States when he returned, he went to China.

The record shows that during his absence anonymous information reached the San Francisco Immigration Office (in which there had been a change of officials) to the effect that petitioner's name was not Kwock Jan Fat, as claimed, but was Lew Suey Chong, and that he had entered the United States in 1909 as the minor son of a merchant, Lew Wing Tong, of Oakland, California. Thereupon an investigation was conducted, chiefly by the comparison of photographs, for the purpose of determining the truthfulness of this anonymous suggestion, with the result that when the petitioner returned to San Francisco he was not allowed to land, and a few days thereafter was definitely denied entry to the country by the Commissioner of Immigration. Thereafter, this decision of the Commissioner was re-considered, the case re-opened and testimony for and against the petitioner was taken, but the Commissioner adhered to his denial of admission. The only reason given for the decision was "the claimed American citizenship is not established to my satisfaction."

Thereupon an appeal was taken to the Secretary of Labor, who approved the order appealed from.

Promptly thereafter the petition for a writ of *habeas corpus* in this case was filed, which is based chiefly upon two claims, viz:

(1) That the examining inspector reported to the Commissioner of Immigration as evidence, statements purporting to have been obtained from witnesses under promise that their names would not be disclosed, and that when demand was made for the names of such witnesses for purpose of reply, it was refused, with the result that petitioner did not have a fair hearing.

(2) That the examining inspector did not record an

important part of the testimony of three white witnesses called by petitioner, with the result that it was not before the Commissioner of Immigration or the Secretary of Labor when they decided adversely to him, and thereby he was arbitrarily denied a fair hearing.

A general demurrer to this petition was sustained by the District Court and on appeal to the Circuit Court of Appeals that judgment was affirmed. The case is here on writ of certiorari.

With the petition were filed all of the testimony and papers pertaining to the proceedings prior to the appeal to the Secretary of Labor, and since it is prayed that when the copy of the proceedings thereafter had shall become available they may be made a part of the petition, it was proper for the courts below and is proper for this court to interpret the allegations of the petition, giving due effect to the immigration records filed with the petition and with respondent's return. *Low Wah Suey* v. *Backus*, 225 U. S. 460, 469, 472.

It is not disputed that if petitioner is the son of Kwock Tuck Lee and his wife, Tom Ying Shee, he was born to them when they were permanently domiciled in the United States, is a citizen thereof, and is entitled to admission to the country. *United States* v. *Wong Kim Ark*, 169 U. S. 649. But while it is conceded that he is certainly the same person who, upon full investigation was found, in March, 1915, by the then Commissioner of Immigration, to be a natural born American citizen, the claim is that that Commissioner was deceived and that petitioner is really Lew Suey Chong, who was admitted to this country in 1909, as a son of a Chinese merchant, Lew Wing Tong, of Oakland, California.

It is fully settled that the decision by the Secretary of Labor, of such a question as we have here, is final, and conclusive upon the courts, unless it be shown that the proceedings were "manifestly unfair," were "such as to pre-

vent a fair investigation," or show "manifest abuse" of the discretion committed to the executive officers by the statute, *Low Wah Suey* v. *Backus, supra,* or that "their authority was not fairly exercised, that is, consistently with the fundamental principles of justice embraced within the conception of due process of law." *Tang Tun* v. *Edsell,* 223 U. S. 673, 681, 682. The decision must be after a hearing in good faith, however summary, *Chin Yow* v. *United States,* 208 U. S. 8, 12, and it must find adequate support in the evidence. *Zakonaite* v. *Wolf,* 226 U. S. 272, 274.

As to the first ground of complaint in the petition for *habeas corpus:*

After the final decision by the Commissioner of Immigration adverse to petitioner, his counsel requested an opportunity to examine the record on which it was rendered. This request was granted, and promptly, thereafter, demand was made for permission to see the testimony referred to, but not reported, in a designated report of Inspector Wilkinson. Assistant Commissioner Boyce answered this request saying:

"That portion of Inspector Wilkinson's report which was withheld from you contained no evidence whatsoever and nothing which was material to the issue in this case. As a matter of fact this inspector's report in no way influenced my decision, and was useful only in locating other material witnesses, whose testimony appears of record."

This report appears in the record before us and is of a remarkable character. It is dated August 8th and after saying that "only upon the assurance that the identity of the witness would be kept secret" could the information contained in it be obtained, the writer proceeds with much detail to narrate what, if believed, would be evidence of first importance making against the claim of petitioner. The report continues, that after his first visit the inspector

returned to Monterey and learned from his confidential witness that in the interval he had inquired of "an old Chinese resident" who said that "Tuck Lee had no son" and adds "I was unable to ascertain the name of this Chinese person."

On the margin of this letter is written August 8, 1917, "approved, Edward White" (the Immigration Commissioner).

In this manner, with much detail, statements of a person who must remain unknown, and in part derived from another person who must remain unknown, were communicated by the investigating inspector to his superior, who was to dispose of the case on the evidence which was furnished him, and he, in form at least, approved of this report. This approval is explained by the Acting Commissioner as referring to the recommendation contained in it that further investigation should be made, and there is confirmation of this explanation in the fact that the record shows that immediately thereafter evidence of the character suggested in the report was taken in affidavits which were open to the inspection of the petitioner. While we would not give the weight to these affidavits which the Commissioner of Immigration and the Secretary of Labor seem to have given to them, nevertheless, when taken with the statement of the Acting Commissioner that the inspector's report objected to was not allowed to influence his decision, we might not say that the taking and reporting of the testimony objected to of witnesses whose names are not disclosed, rendered the hearing so manifestly unfair as to require reversal,— if there were nothing else objectionable in the record.

There remains the question whether the hearing accorded to the petitioner was unfair and inconsistent with the fundamental principles of justice embraced within the conception of due process of law because an inspector failed to record in its proper place an important part of

the testimony of three white witnesses called by the petitioner.

A discussion of what the record shows and of the character of the witnesses involved will be necessary to an appreciation of the importance, in determining the issue presented, of having a full report of what was said and done by these three witnesses.

When the petitioner, before going to China, applied for a preinvestigation of his claimed status as an American citizen, three white witnesses from Monterey were called in his behalf,—two of whom were notable.

Ernest Michaelis, for twenty-six years a Justice of the Peace and for many years the official collector of fish licenses, testified, making reference, for purpose of identification, to a photograph of the petitioner. He said he had known the parents of the boy since shortly after he himself went to live at Monterey in 1879; that there were two boys and three girls in the family; that he had seen the petitioner frequently as a little fellow when he went to collect fish licenses (the boy's father was a fisherman); and had known him ever since; and, referring to the photograph, he declared positively that he was sure of his identity and that he was born in Monterey. He added that the father of the boy was native born and was a voter in that community.

W. E. Parker testified that he had been agent for the Wells Fargo Company at Monterey for twenty-five years, and was also chief of the fire department and city clerk for many years. He said, referring to a photograph of petitioner, that he had known the parents of the boy for many years and the boy himself since he was five or six years old; that he remembered two boys and at least one girl, but later he stated that he recalled that there were three girls in the family, and his identification of the petitioner by photograph was very definite. He stated that the father of the boy was a fisherman and shipped fish fre-

quently by express so that he came to know him well and his wife also because she often transacted business for her husband. He recalled that after the fire and earthquake the petitioner was sent to school at San Francisco, but returned to Monterey every few months when he saw him.

A third witness, Manuel Ortins, a retired business man, gave similar testimony, but it is not so definite and circumstantial as that of the others and need not be detailed.

The Government Inspector, to whom the case in this preliminary stage was referred, wrote the Commissioner of Immigration at San Francisco that the testimony of petitioner, of his alleged brother, his mother and three credible white witnesses had been taken; that the petitioner gave his testimony mostly in English, presented a good appearance, and "tells his story in a straightforward manner in a way to convince one that he is telling the truth," and that "the three white witnesses are representative men of this town and would have no motive in mis-stating the facts." He concluded with the statement that in his mind there was no doubt that the Chinaman named Kwock Tuck Lee (claimed by applicant to be his father) had lived in Pacific Grove (the Chinatown of Monterey), and was a registered voter there; that he was married and had several children and that the testimony seemed to prove that the petitioner was a member of his family. He added that a sister of the boy lived at a given number in Chicago and suggested that her testimony should be taken. This sister's testimony was taken, as recommended, and then the inspector reported to the Commissioner of Immigration that her testimony did not vary in the main from that of the mother or brother of the petitioner; that "the white witnesses, Judge Michaelis, and chief of the fire department and Wells Fargo agent, and retired grocer, Mr. Ortins, are men of standing in this town" and that he had no reason to doubt their testimony. He added, that, taking the testimony as a whole "he

believed the applicant made a good showing and recommended favorable action." On this record the application was approved and the young man went to China.

When the petitioner returned from China and the investigation was renewed Michaelis, Ortins and another important white witness, Pugh, were examined at San Francisco by an inspector. Michaelis and Ortins testified substantially as they had done a year before, and Pugh, also a business man of Monterey, gave similar testimony and definitely identified the petitioner as the son of Kwock Tuck Lee. The examination of these witnesses, by question and answer, was taken down and is in the record, but no reference whatever was made to the fact that the petitioner was brought into their presence to test their recognition of him and his recognition of them, or of any examination in his presence. The testimony was in this form when it was sent to the Commissioner of Immigration for his consideration and decision, and, acting upon it, on September 6, 1917, he denied the petitioner admission to the country. After this decision, on September 12th, counsel for petitioner wrote the Commissioner that Michaelis, Pugh and Ortins had told him that when they were examined at San Francisco they were confronted with the petitioner and that they recognized him, that he recognized them, and that the examining inspector was present and asked a number of questions, which were answered, and calls this to the attention of the Commissioner "as it may have been an oversight on the part of the official stenographer in not recording everything said and done at the hearing of the case." On the same date affidavits by Michaelis, Pugh and Ortins were filed, in each of which, after referring to his examination at San Francisco, the affiant says in substance, as Michaelis does in form, that "after being questioned by the inspector the affiant was confronted with Kwock Jan Fat who met him while the inspector was present and that said inspector

heard everything said between affiant and Kwock Jan Fat;" and that affiant then told the inspector that the petitioner was the son of Tuck Lee, that he had known him from infancy, and that he was a native of Monterey.

To this letter of counsel for petitioner an Acting Commissioner replied, saying:

"With regard to the identification of the applicant by Messrs. Michaëlis, Pugh and Ortins, you are advised that these witnesses were confronted with the applicant with the result that said witnesses mutually recognized and identified the applicant as the person whom they had known as Kwock Jan Fat, and the applicant was equally prompt in recognizing said witnesses. While I was advised of this incident and gave it full consideration in arriving at my decision, it was not made of record in connection with the statements taken from the witnesses. A copy of this letter will be placed with the record as evidence to the fact that there was mutual recognition between said witnesses and the applicant which will thus be available for the consideration of the Secretary on appeal."

This excerpt from the letter of an Acting Commissioner (the decision was rendered by the Commissioner personally) is the only form in which the facts and circumstances of the recognition of the petitioner by these important witnesses and their examination in his presence by the inspector was placed before the Secretary of Labor, and apparently there was no record whatever of either before the Commissioner of Immigration when he decided the case.

Comment cannot add to the impression which this plain statement of facts should make upon every candid mind. Here was testimony being taken which was to become the basis for decision by men who must depend wholly upon the report of what was said and done by the witnesses. The men examined were important, intelligent and very

certainly as dependable as any who were called. All they had said with respect to the identity and nativity of the petitioner when his photograph was exhibited to them was carefully reported, but when their knowledge of him and their acquaintance with him was put to the final test of having him brought before them (he had then been in China for a year), nothing whatever was recorded of what they said and did. Very certainly this must be regarded as such an important part of the testimony of these most important witnesses that it may well have been of such character as to prove sufficient to determine the result in a case even much stronger against a claim of United States citizenship than was made in this record against the claim of petitioner, and a report which suppressed or omitted it was not a fair report and a hearing based upon it was not a fair hearing within the definition of the cases cited.

The acts of Congress give great power to the Secretary of Labor over Chinese immigrants and persons of Chinese descent. It is a power to be administered, not arbitrarily and secretly, but fairly and openly, under the restraints of the tradition and principles of free government applicable where the fundamental rights of men are involved, regardless of their origin or race. It is the province of the courts, in proceedings for review, within the limits amply defined in the cases cited, to prevent abuse of this extraordinary power, and this is possible only when a full record is preserved of the essentials on which the executive officers proceed to judgment. For failure to preserve such a record for the information, not less of the Commisioner of Immigration and of the Secretary of Labor than of the courts, the judgment in this case must be reversed. It is better that many Chinese immigrants should be improperly admitted than that one natural born citizen of the United States should be permanently excluded from his country.

454. Orders.

The practice indicated in *Chin Yow* v. *United States,* 208 U. S. 8, is approved and adopted, the judgment of the Circuit Court of Appeals is reversed, and the cause is remanded to the District Court for trial of the merits.

*Judgment reversed.*

*Writ of habeas corpus to issue.*