## Ex parte CHIN YOKE TUNG.

District Court, W. D. Washington, N. D.
Dec. 23, 1932.

Hugh C. Todd, of Seattle, Wash., for petitioner.

Anthony Savage, U. S. Atty., and H. P. Dodd, Asst. U. S. Atty., both of Seattle, Wash.

### JAMES C. WILSON, District Judge.

Chin Yoke Tung petitions for an order to the Immigration Commission at Seattle, Wash., to show cause why he should not be granted a writ of habeas corpus, alleging he is unlawfully detained by such officer, under an order of deportation. He was admitted to the United States July 17, 1917, as a Chinese exempt, with a status of minor son of a legally domiciled Chinese merchant. He has been legally such domiciled resident of the United States since that date. Between the date of his admission and 1930 he was twice given permission, by the immigration authorities, to visit China. His first visit was, as a Chinese merchant, in 1921, returning in 1924. The second visit, with a Chinese laborer's return certificate, was in 1926, returning in 1927. His third visit was under a Chinese laborer's one-year return certificate dated January 25, 1930. He returned June 9, 1931, with a consular overtime certificate, having, without permission, extended his visit beyond a year.

The controlling statute to be construed is the Act of September 13, 1888, 25 Stat. 476, 477 (see 8 USCA § 275):

Section 5. "That from and after the passage of this act, no Chinese laborer in the United States shall be permitted, after having left, to return thereto, except under the conditions stated in the following sections."

Section 7 of this same act (see 8 USCA. § 277) provides: "The right to return under the said certificate shall be limited to one year; but it may be extended for an additional period, not to exceed a year, in cases where, by *reason of sickness or other cause of disability beyond his control*, the holder thereof shall be rendered unable sooner to return, which facts shall be fully reported to and investigated by the consular representative of the United States at the port or place from which such laborer departs for the United States, and certified by such representative of the United States to the satisfaction of the Chinese Inspector in charge at the port where such Chinese person shall seek to land in the United States * * * and no Chinese laborer shall be permitted to re-enter the United States without producing to the proper officer in charge at the port of such entry the return certificate herein required. * * *"

On June 12, 1931, a Special Board of Inquiry at Seattle heard petitioner's application for readmission as a returning overtime laborer. The applicant was the only witness examined. Touching his reasons for remaining overtime the following questions were asked and answered:

"Q. What reason have you to advance now as to why you failed to return within the time limit stated in the certificate issued to you? A. On account of the death of my first wife.

"Q. When did your first wife die? A. CR 19—10—1 (November 20, 1930).

"Q. How long was your wife sick? A. About three months.

"Q. Why did you remain in China so long after your wife died in view of the fact that there remained sufficient time for you to return to this country before your certificate expired? A. My two sons were so small—I needed someone to take care of them. I went to the American Consul at Hongkong and reported the matter. I was advised by the Consul that I could stay six months longer so that I could marry again and get someone to take care of my sons."

On this evidence the Board of Special Inquiry denied readmission, the factual conclusion upon which decision was based being: "Remaining in China for the purpose of marrying is not considered to be an unavoidable cause."

The sole authority cited by the Board of Special Inquiry, as upholding the ruling, is Nagle v. Toy Young Quen, 22 F.(2d) 18 (C. C. A. 9th). In other words, the Board of Special Inquiry found as a fact that remaining overtime to get married was his reason. The evidence is not in the record to support any such conclusion, but, instead, that his overtime was to marry a woman, not for the comforts, pleasures and happiness of marriage, but for the purpose of getting a caretaker for his children.

There is no need to elaborate as to the absence of evidence to support such finding of the Special Board of Inquiry, since the applicant took an appeal from its decision to the Board of Review at Washington, D. C., and it entirely ignored such ground assigned by the Board of Special Inquiry. In other words, it is evident the Board of Review on examination of the record saw that the ground of the decision could not be upheld, as being based upon any evidence. It did not expressly repudiate the basis of the decision, simply ignored it, basing its decision on entirely different grounds. It follows that the case of Nagle v. Toy Young Quen, supra, is not applicable. There the overtime was simply to get married, purely for the sake of marriage, with all the relation ordinarily implies. The very suggestion, that to remain overtime for such a marriage would constitute "sickness or other cause of disability beyond control," is absurd on its face. The soundness of that decision, of course, cannot be questioned. It is not absurd, however, for a man to testify that his purpose in getting married was to provide a caretaker for his children. Men and women marry in our own country for all kinds of reasons and purposes, where necessity and judgment, and not affection, determines the

issue; men to get housekeepers; women to get care and protection for themselves; widowers to get caretakers and mothers for their children, where marriage is only a means to some other definite end. To confirm this we need only to resort to our common experience and observation. In all my experience I have never seen a case where the circumstances made it more imperative for the father to marry in order to provide a mother, as an affectionate, interested, caretaker for children. Under the plan, he would only see this wife every three or four years. It would take time to get a suitable woman who would accept such a marital arrangement, imposing practically nothing but work and serious obligations, with little of the pleasures and joys and happiness ordinarily incident to the relation.

Now, the Board of Review faced the issue presented by the applicant fairly and without evasion. In other words, they accepted as true the applicant's assigned reason for his overtime, to wit, the care of his children. It first passed on the matter June 27, 1931. The decision was to dismiss the appeal. In this decision, they cited the applicant's assigned reason, in their words: "To provide a suitable mother's care for his two young children." It will be noted they did not hold, to remain overtime to accomplish this was not a "disability beyond control." They met that reason with this ruling: "However, it appears that the applicant's mother is living so that provision for the care of the children might reasonably be made otherwise than by his remarriage. Moreover, according to the statement contained in the overtime certificate, as well as the testimony of the applicant, his first wife died nearly two months before the expiration of the year contemplated in his return certificate when with reasonable expedition he might have made adequate provision for the care of his children without delaying his return beyond that year. It is also to be noted that the applicant's statement concerning the illness and death of his wife as given at the American Consulate in Hongkong and at the port is uncorroborated. * * * It is the opinion of the Board of Review that the evidence does not establish that the applicant was prevented from returning within one year after his departure by reason of "sickness or other cause of disability beyond control."

Subsequent to this decision, Senator Dill became interested, and, through his secretary, intervened in behalf of the applicant,

and a further hearing was accorded; the second decision being announced by the Board of Review on July 30, 1931. Again, they decided to dismiss the appeal, substantially on the same ground as theretofore. It said: "The children might have been otherwise cared for either by marrying a woman for this purpose or leaving them with his mother in whose house they reside."

First, as to the suggestion of the Board that the applicant's statement concerning the illness and death of his wife was uncorroborated. This is true, the immigration authorities sought no evidence other than that given by the applicant. There is a letter from the Vice Consul at Hongkong, dated May 4, 1931, and which was referred to by both Boards in their hearings. If there was any responsibility to secure evidence, corroborative or impeaching, as to the illness and death of the applicant's wife, or dereliction for failure to do so, it does not rest upon the applicant but upon the immigration authorities. The article of the statute, quoted supra, requires that any sickness or other cause of disability beyond the certificate holder's control, which he may be assigning as a ground for remaining overtime, "shall be fully reported to and investigated by the consular representative of the United States at the port or place from which such laborer departs for the United States, and certified by such representative of the United States to the satisfaction of the Chinese Inspector in charge at the port where such Chinese person shall seek to land in the United States." The testimony of this applicant corroborated is that he complied strictly with this requirement; that he reported first the illness and later the death of his wife and the situation with respect to his children and the necessity of marrying a woman in order to care for them. The letter from the Consul states that the applicant appeared to him twice in Hongkong, once to report the illness of his wife and next her death. It also disclosed that the consul made no investigation, as the statute required him to make, touching the truth of these reports made by the applicant. In so failing he violated the provisions of this statute while the applicant, as ignorant as he evidently was, complied with it. It is required that the Consul not only investigate the facts, but certify them to the satisfaction of the Chinese Inspector in charge at the port where such Chinese person shall seek to land in the United States, which in this instance was Seattle. This requirement also was ignored. The record does not disclose that the immigation

authorities at Seattle sought to have such investigation made. If any was made, by wire or otherwise, they did not disclose the result. There appears, therefore, to be nothing in the record in the nature of evidence other than petitioner's testimony by which this can be checked. Only a letter, as heretofore stated, from the Vice Consul which I find only in the government's brief. The record does not disclose, preparatory to the hearing by the Special Board of Inquiry, that the applicant was given the opportunity to secure other evidence corroborative of his statement. It does disclose that he was not represented by counsel before the Board, nor by relative or friend, which impresses me as not quite fair. If corroboration, under such circumstances, is required of such an applicant, before anything he says can be believed, why should the immigration authorities, as at Seattle, hold such a hearing introducing such applicant, as the sole witness, and give him no opporunity to offer corroborative evidence? It would take either a statute, or some rule of evidence by competent authority, to require such corroboration, and I know of neither. Now, certainly, the fact of the absence of corroboration of the applicant must pass out of the case, as a basis of the Board of Review's decision.

The question here is: Did the applicant present, as a ground for his overtime, "sickness or other cause of disability beyond his control"? The Board did not hold that sickness had reference only to the sickness of the certificate holder. The statute could have so expressly provided, but it did not. The sickness of the certificate holder, of course, is embraced, but a reasonable construction would not so limit it. In fact, the immigration authorities themselves recognize that the illness of near relatives, such as a mother, are included. The authorities, also, support this view. Nagle v. Toy Young Quen (C. C. A.) 22 F.(2d) 18. The Board did not hold that care for the children was not such a statutory cause, but that petitioner should have provided the care within the year. The illness and death of a wife, of course, would constitute such cause. The very infancy of these boys, five and eight, rendered them as dependent and helpless as illness would. Such infancy and the imperative obligation of parental care, under the words, "other cause," would be on a parity with a disabling illness of such child. The provision should be given a common-sense construction, to include such as, in the serious affairs of life, are commonly regarded disabilities beyond

control. If to care for a sick wife is such a disability, it follows to care for such infant children is. The Board of Review did not undertake to deny the justice and reasonableness of such a construction.

The grounds of the Board of Review's two decisions, other than lack of corroboration of the applicant's statement, are substantially the same, but more concisely stated on the occasion of its last hearing, January 30, 1931, as follows: "In the opinion of the Board of Review the children might have been otherwise cared for either by marrying a woman for this purpose or leaving them with his mother in whose house they reside."

[1, 2] They hold one of the two he should have done before the expiration of his one year certificate. If there is not substantial evidence upon which such finding can be based, the authorities hold this matter may be reviewed by the courts. Kwock Jan Fat v. Edward White, 253 U. S. 454, 40 S. Ct. 566, 64 L. Ed. 1010; Hughes v. U. S. (C. C. A.) 295 F. 800; U. S. ex rel. Duner v. Curran (C. C. A.) 10 F.(2d) 38; U. S. v. Curran (C. C. A.) 4 F.(2d) 356; Ex parte Cheung Tung (D. C.) 292 F. 997. Was there substantial evidence to support both, or either, of these findings? We will take them in their reverse order. As to the mother and leaving her to care for the children, in their first decision the Board of Review said: "However, it appears that the applicant's mother is living so that provision for the care of the children might reasonably be made otherwise than by his marriage." If there are words in the statute justifying an extension of time to provide for children, it would not contemplate a makeshift provision, nor anything less than adequate provision. There is no evidence in this record touching the qualifications or the fitness of petitioner's mother to care for these children 'except that she was between fifty and sixty years of age and was sick most of the time. The Board was mistaken when it said the children were living in the mother's home. She and the children were living in petitioner's home. Here is the testimony, and all of the testimony, touching the fitness or ability of the mother to care for the children:

"Q. Who was living in your house with your two children from the time you last arrived in China? A. My mother and my first wife.

"Q. Is your mother still living? A. Yes.

"Q. How old is she? A. Over fifty years old, and under sixty.

"Q. Is your mother capable of taking care of your two children? A. *Not very well, she has been sick most of the time.*"

In other words, this finding must be based, if based at all on evidence, on the bare fact that the mother was living, and that she was sick most of the time. That part of the answer made by the applicant, "not very well," was merely a conclusion which he followed with the evidence upon which he based it. Besides, "not very well" might have been said in a way and probably was that spurned the very suggestion, followed, as it was, by the statement she was sick most of the time. How old is a Chinese woman who has lived fifty or sixty years in China? I don't know. The number of years people live is not conclusive as to how old they are. No questions were asked about her decrepitude. The applicant made no voluntary statement. All of his evidence was given in response to questions of immigration authorities. No questions were asked as to what her illness was. If it was a contagious disease, tuberculosis or what not, the record is silent. How long it had lasted is not disclosed further than the evidence above, which, fairly construed, would indicate that it was chronic. Would it be adequate provision, or care, to leave two infants, boys at that, five and eight, in the care of such a grandmother (no evidence of other relatives), where the father must be absent for years at a time, living five thousand miles from them? It is difficult to conceive any arrangement that would fill with more anxiety any father's heart having even the affection that animals have for their young, or which would, with more certainty, threaten the welfare of all three. The care of boys at that age is a task for a whole family. Deportation of an alien long domiciled in our country carries odium; it imports wrongdoing or crime. Is the precedent to be set in this country that such a lawfully domiciled alien for fourteen years, who has been thrifty and law-abiding, is to be deported to China because he did not impose, both on his mother and on his infant children, by leaving them together, alone, and uncared for? The very condition of the mother and care for her, under the statute construed, was itself a disability beyond the petitioner's control. Any father with the affection of a normal human being would have considered it necessary, facing as he was an enforced absence of years, to provide a woman,

young, able, and willing, and, if possible, with love in her heart, to care for all three. Such a conclusion by the Board was a mere speculative conjecture, not only without substantial evidence to support it, but without any evidence.

The Board at its last hearing prefaced its opinion by saying: *"Accepting the applicant's statement as to the facts."* It then proceeded to make said findings. Such boards are clothed with broad authority in such matters. Nothing is better recognized than this. Be that as it may, such authority does not go to the extent of empowering immigration authorities to take a positive statement by a witness to a fact, and construe it to establish exactly a contrary fact; that evidence only of sickness and disability proves health and capacity. The finding of the Board that leaving the children with the mother would have been adequate care for them, or, in truth, any care at all, is without any evidence. Nor is it in evidence that anybody consulted the mother about the Board's proposition of her caring for these children. It all goes to show the Board's decision was purely arbitrary and in spite of the only evidence it had.

Now, as to the other finding, that he could have cared for them by "marrying a woman for this purpose," and that that could have been accomplished within the two months after the death of the wife and before the expiration of the certificate. What evidence is there in the record to support these findings, if reasonably adequate provision for the children was contemplated? Again, this conclusion is entirely an assumption and not based on substantial evidence. If based on evidence at all, it is based upon the statement of the petitioner that he could not find a girl in that time. Here are the questions and answers:

"Q. Did you marry again? A. Yes.

"Q. What is the date of your second marriage? A. CR 20—2—15 (April 2, 1931.)

"Q. When did you decide that it would be advisable to marry again? A. A few days after my wife died.

"Q. Why is it that you did not get married within a few days and then be able to return to the United States in time? A. I could not find a girl in that time.

"Q. Did you make any attempt to find a second wife shortly after the death of your first one? A. Yes.

"Q. How much time elapsed from the date of the death of your wife until you made any diligent attempt to find a second woman to marry? A. A little over ten days.

"Q. How many days elapsed from the time you first heard of your second wife until you married her? A. A little over ten days."

Now, the logic of the Board evidently was, since the petitioner married his second wife in ten days after he heard of her, that ten days after the death of his wife was a sufficient time for him to remarry. A reasonable construction of the petitioner's answer, "I could not find a girl in that time," would be a suitable girl, from the standpoint of family, morality, health, age, disposition, temperament, affectionate nature, etc. We cannot try this man on the evidence we get from "Good Earth" or "Sons" as to the customs and habits of Chinese. We know from the current newspaper reports that this man could have gone to the auction block and bought a wife for a small sum. By being asked the question why he did not marry "within a few days" indicates clearly that the immigration officers felt that one of the auction wives, to be over the children, would have been adequate provision. It is evident they applied all of their private knowledge to this man's case which they are not permitted to do. In any event, the petitioner was on the ground acquainted with all the facts, was confronted with the most trying, tragic circumstances, and he testifies that he used diligence and was not able to find a girl within that time. The evidence shows that this man was thirty and his second wife, Wong Shee, was twenty-eight. The fact that he married Wong Shee in ten days after he met her is no evidence that he should have found and married her within ten days after his wife's death. A common fault of all of us, in judging others, is the failure to comprehend, especially through evidence, the other's viewpoint. No such time was taken, but a year, under our ideals, would not be an unreasonable length of time to marry a second time.

■ As representatives and spokesmen of our government, in such matters, we have no right to fix a standard, for a Chinese lawfully domiciled with us, of less affection for his children than we possess for ours; less duty to make adequate provision for the rearing and education of his children than we expect and require; or less grief in the loss of a wife, mother, and the orphanage of his children than we suffer; especially where

there is no evidence, even touching their ideals and standards, to say nothing of those of this petitioner. We cannot base any part of decision on our private, preconceived notions of their standards of domestic life or that adequate care of our children means one thing, and for them a much lower thing; nor can we base a finding of decisive fact on the common knowledge of foreign character or customs. The court itself cannot take judicial knowledge of facts to establish or disprove the very issue on which the case is tried, but only facts collateral to such issue. The only evidence in the record, anywise bearing upon the subject as to the ability of this petitioner to adequately care for his children, discloses, as to health, business experience, employment, investments, and accumulations, that he was well able to adequately provide for them, an adequacy which would encompass their comfort, their happiness, wholesome food and environment, and, as well, their education. Under our ideals, this is a God-given privilege to any father. Here where the evidence discloses beyond dispute that the illness and death of his wife and the necessity of properly caring for his children was the sole cause of the overtime, is he to be deported to China because he waited to make such adequate provision, and was without sufficient time to do so between the death of his wife and the date his one year certificate expired? The Board holds that he should have married within those two months, and within that time, placed the new mother in charge of them and departed for the United States. The Board cannot decide that arbitrarily. Its judgment cannot be substituted for the positive evidence of this petitioner as to his inability to make such domestic arrangements within that time. As to the duty and the necessity of the petitioner marrying within two months after his wife's death, the Board certainly does not get that from our traditions or ideals. Where they get it the record does not disclose. Such marriages with us shock the individual conscience, and, where notable, the public conscience as well. The children and the mother should have been cared for. It presented a difficult and delicate task. It was the selection of a mother for his children. The element of permanency, of course, along with the traits of character mentioned heretofore, were impelling considerations. If a governess or girl were hired, the possibility of marriage or finding better employment would menace its permanency. As a measure of adequacy, the superiority of a wo-

man, in loco parentis, to one on a hireling's basis, is too evident for argument.

It must be kept in mind that the issue was, his reason for letting the one year expire before his return. His conviction is not for taking too much time after the year expired to thus provide for his children. Every question was, why he did not make these arrangements, after his wife died, and within his year. Delay in marrying until April 2, 1931, is not the issue, nor the ground of the Board's decision. Nor is the fact that he remained with the new wife a month after he married, the issue. He was not questioned as to why he did or did not do anything after the year expired. There is no evidence touching that period. If left to me, without any evidence other than lapse of time, I would hold the time taken not unreasonable, particularly the month spent with Wong Shee, to acquaint her with his mother and children, to build up affection for them, to plan the future on some workable basis, and to adjust her into his order of domestic life. Adequate provision would justify the time so taken.

My conclusions are that the findings of the Board of Review are not supported by any substantial evidence. It is, furthermore, my conclusion that this decision was shockingly unjust and was an abuse of discretion. I do not know how to consider this man's case except on the basis that he is a human being. As stated, this petitioner was admitted as an exempt when fourteen years of age. He was too young then to be acquainted with the commercial life of China. To date, he has spent something more than seventeen years in this country. His business knowledge is of our system. His record is without a blemish as far as the evidence discloses. If he had been a law violator or a criminal, the immigration authorities, considering their intimate, constant touch with Chinese, would have produced the evidence. It is undisputed that he has a $1,000 Liberty bond. He also has an investment in a business in Seattle. Immediately prior to this trip he was a waiter in a restaurant in New York. It is doubtful if any American citizen would take his place were he deported and though deported he would leave with us thousands of Chinese. Be that as it may, his deportation should not violate the principles of justice and humanity, and the treaties between our country and China, for time immemorial friendly to us. The petitioner, though a citizen and subject of China, has a right of domicile with us, and though it is not an inalien-

able right, it is nevertheless a valuable privilege to petitioner, and cannot be taken from him without lawful authority.

For the reasons stated the writ of habeas corpus will be granted.