## UNITED STATES ex rel. SHAW v. VAN DE MARK et al.

District Court, W. D. New York.
April 5, 1933.

Winchell & Cameron, of Rochester, N. Y., for relator.

Richard H. Templeton, U. S. Atty., of Buffalo, N. Y. (Joseph J. Doran, Asst. U. S. Atty., of Rochester, N. Y., of counsel), for respondents.

ADLER, District Judge.

A writ of habeas corpus has been taken out in behalf of the relator, Sarah Ada Elizabeth Shaw, an alien, born in England November 2, 1870, and who entered the United States on March 20, 1903, and continuously resided in this country from that date until the year 1926, during which year she went to Canada for a visit lasting approximately four months and then returned to the United States. A warrant of deportation directing that she be deported to England has been issued upon the charge that she has been found in the United States in violation of the Immigration Act of February 5, 1917 (section 19 [8 USCA § 155]), for the following reasons: "That she was a person of constitutional psycopathic inferiority at the time of her entry into the United States; that she was a person likely to become a public charge at the time of her entry; and that she became a public charge within five years after entry into the United States from causes not affirmatively shown to have arisen subsequently thereto."

The entry mentioned and necessary to justify deportation must be that which occurred in 1926 when she returned to the United States after a visit to Canada. The proceeding resulting in the warrant of deportation was commenced pursuant to a warrant of arrest issued by the Department of Labor. Subsequent thereto, a warrant of arrest was served upon the relator while she was confined in the Rochester State Hospital as an insane person, and the warrant provided that

the relator be granted a hearing to show cause why she should not be deported.

Under date of November 3, 1927, at the Rochester·State Hospital, and where the relator had been in custody for over a year as an insane person, she was granted a hearing at which she was not represented by counsel, nor does it even appear that a relative or ,friend or committee of this unfortunate woman was present at the time. At this hearing and under these circumstances she was questioned at length by an Immigration Inspector, and a transcript of the testimony there taken discloses that at the beginning of the examination the following question was put to her: "Do you desire to obtain the services of a lawyer? A. No, I have no right to a lawyer."

Following the question and answer quoted, the relator answered numerous questions, and, so far as the transcript appears, her answers appear to be intelligent. During the course of this questioning, the relator admitted the fact that she left the United States in 1926, for a visit to Canada, lasting approximately four months, and then returned to this country, and almost immediately thereafter went to the Rochester State Hospital, at which institution she had been confined continuously for a period of one year when the hearing was conducted. In addition to the transcript of the testimony of the relator at the hearing conducted under the circumstances above mentioned, the only other evidence tending to support the charges upon which the warrant of deportation was issued appears to be a summary of an examination of the relator on October 7, 1927, by Dr. Pierson at the Rochester State Hospital, and a certificate of an examination conducted on October 11, 1927, by Dr. A. E. Barton, a medical examiner for the state of New York; both to the effect that the relator on the dates of the examinations was suffering from "involution melancholia" with very little chance for recovery.

■■ The petition upon which the writ of habeas corpus herein was issued alleges that the relator was not accorded a fair and impartial hearing. If this be true, the writ should be sustained. While it is true that "proceedings for the deportation of aliens are of a civil rather than criminal character," U. S. v. Lee Hee, 60 F.(2d) 924, 925 (C. C. A. 2d), and that "a hearing granted does not cease to be fair, merely because rules of evidence and of procedure * * * have not been strictly followed," Bilokumsky v. Tod, 263 U. S. 157, 44 S. Ct. 54, 57, 68 L. Ed. 221, nevertheless, a hearing may be considered unfair where "the practice complained of * * * might have led to a denial of justice," Bilokumsky v. Tod, supra. In each of the cases cited, the query was whether or not admissions of an alien made under arrest and while in confinement were admissible against him in deportation proceedings, and the courts there sustained the proposition that such admissions were competent evidence under the circumstances there existing.

■ But here the situation is more aggravated because the relator at the time of her examination was not only in the custody of a state institution as an insane person, but, in addition thereto, she was not even represented by counsel, friend, or relative; and assuming, as we must, that at the time of this examination she was hopelessly insane, and that her testimony given under such circumstances must support the warrant of deportation, first, there arises the question as to whether such testimony is competent even in deportation proceedings, where the strict rules of evidence do not apply; and, secondly, whether or not a hearing granted under such circumstances is fair and impartial.

■ The general rule ·is that "a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." District of Columbia v. Armes, 107 U. S. 519, 2 S. Ct. 840, 842, 27 L. Ed. 618. Professor Wigmore states: "There was a period when the lunatic and the idiot in the superstitious belief of the times, which regarded madness as an infliction sent from heaven, were treated as incapable of being witnesses at all, but this indiscriminate ruling of exclusion since the progress of our intelligence respecting mental derangement has been modified and rationalized." Certainly there is no proof here that the relator understood the nature of an oath or even the nature of the proceeding itself.

■ Our Circuit Court of Appeals in U. S. v. Lee Hee, supra, stated: "Lee Hee had an opportunity to cross-examine the officers who interrogated him and to adduce evidence, if any there was, that his statements were not made understandingly or voluntarily." Surely the relator at the hearing in this case, conducted under the circumstances mentioned, cannot be said to have had the mental capacity to even understand the nature of the proceeding concerning herself. In fact, the question and answer quoted above indicate clearly that she did not even have the mental

capacity to understand that she was entitled to be represented at the hearing by counsel.

A similar situation in which the circumstances were almost identical to the one under consideration existed in Re Osterloh (D. C.) 34 F.(2d) 223, where District Judge Hutcheson stated as follows:

"Here is a case of a hearing conducted, not in a manner and for the purpose of developing the real facts, but in a manner and for the purpose of substantiating a predetermined conclusion. Such a hearing is not valid. *  *  *

"In the colloquy over the forthcoming trial of Rebecca, Sir Walter Scott makes the parties to it say, 'I ordered the hall for his judgment seat.' 'What,' said Bois Guilbert, 'so soon?' 'Aye,' replied the preceptor, 'the trial moves rapidly on when the judge has determined the sentence beforehand.'

"Upon the plainest principles then of universal justice, no fair hearing has occurred here; rather has the hearing been stripped of the conditions which make for justice. If the charges presented against this young woman, a stranger in a strange, though adopted, land, speaking English imperfectly, and relying upon one man as inquisitor, interpreter, prosecutor, and judge, had not involved charges of her mental deficiency, the fell expedition of the proceedings would invalidate the findings; but, when it is considered that the charge brought and claimed to have been established by the inquisitor was that of mental deficiency, the gross unfairness of the hearing becomes more clear."

The Supreme Court, in discussing the fairness of a hearing accorded a Chinese person in Kwock Jan Fat v. White, 253 U. S. 454, 40 S. Ct. 566, 567, 64 L. Ed. 1010, stated:

"It is fully settled that the decision by the Secretary of Labor, of such a question as we have here, is final, and conclusive upon the courts, unless it be shown that the proceedings were 'manifestly unfair,' were 'such as to prevent a fair investigation,' or show 'manifest abuse' of the discretion committed to the executive officers by the statute. *  *  *

"The acts of Congress give great power to the Secretary of Labor over Chinese Immigrants and persons of Chinese descent. It is a power to be administered, not arbitrarily and secretly, but fairly and openly, under the restraints of the tradition and principles of free government applicable where the fundamental rights of men are involved, regardless of their origin or race. It is the province of the courts, in proceedings for review, within the limits amply defined in the cases cited, to prevent abuse of this extraordinary power."

The relator being ordered deported under a warrant of deportation which cannot be sustained except upon consideration of the testimony of the relator, concededly hopelessly insane at the time such hearing was held, and being then and there without representation of any character, I am of the opinion that a fair and impartial hearing was not granted the relator, and that the fundamental principles of justice require that the writ of habeas corpus should be sustained.