**LIM KWOCK SOON and Lim Kwock Min,**
**Appellants,**

v.

**Herbert BROWNELL, Jr., Attorney General of the United States of America,**
**Appellee.**

**No. 16417.**

United States Court of Appeals
Fifth Circuit.

April 1, 1958.

Rehearing Denied May 22, 1958.

Harold D. Putman, Putman, Putman, Strong, Reid, Murray & Taylor, Joseph J. Reid, Richard G. Strong, San Antonio, Tex., for appellants.

Malcolm R. Wilkey, U. S. Atty., Sidney Farr, Asst. U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge.

This action sought a judgment declaring Lim Kwock Soon, hereafter called Soon, and Lim Kwock Min, hereafter called Min, who were born in China, to be nationals and citizens of the United States.[1] The district court, on a full opinion,[2] entered judgment dismissing the action.

Lim Thl, hereafter called Thl, was the alleged father of Soon and Min. Thl was a citizen of the United States and his father before him had been a citizen of the United States, born in San Francisco. Thl had resided in Houston, Texas for

1. The action was brought September 12, 1952 under the provisions of Section 503 of the Nationality Act of 1940, 54 Stat. 1171, then 8 U.S.C.A. § 903, the subject now being covered by 8 U.S.C.A. § 1503.

2. Reported as Lim Kwock Soon and Lim Kwock Min v. Brownell, D.C., 143 F. Supp. 388.

more than twenty years, where he operated a grocery store. Thl was born in China on November 2, 1910, and first came to the United States in 1930;[3] lived in Oakland, California for about a year, until August 1931, and then returned to China where he remained for nearly three years, until May 1934. During that stay in China, he claims that he married Lee Yuck Gee at Ai Leung village, Toy Shan District, China on October 2, 1931; and that later his wife gave birth to their two sons, Soon and Min. Thl left San Francisco about the first of August 1947 on a second trip to China and stayed one year, until August 17, 1948. During this second visit, he claims that another son, Lim Kwock Hong, was born to his wife. This youngest son is still in China.

Lee Yuck Gee left her son, Lim Kwock Hong, in his grandmother's care while he was a young infant and entered the United States on January 24, 1949.[4] She went immediately to Houston, Texas, where she lived with Thl as his wife. A daughter was born at St. Joseph's Hospital in Houston in 1950. On December 18, 1953, Lee Yuck Gee died and was buried in Houston. Her death certificate showed that she was again pregnant at the time of her death. Her printed funeral notice in evidence names her husband, three sons, and daughter.

By stipulation, a transcript of the testimony given at a Board of Special Inquiry Hearing held in San Francisco, California, beginning on October 9, 1951 and concluding on April 25, 1952, was introduced. On October 9 and 10, and again on November 13, 14 and 15, Soon and Min were subjected to the most minute and detailed questioning concerning their life in China and the number and names of their relatives, going back to the brothers and sisters of their grand

parents. They were required to identify photographs of their father when he was a young man, of their paternal grandfather, of their second uncle, of their fifth paternal uncle, of their first paternal uncle, his wife, daughter, and two of his sons.

Those photographs, along with eight letters, and significantly only seven envelopes, purportedly to them from Thl and Lee Yuck Gee, and with photostatic copies of six American Express Company money orders, each in the sum of $50.00, sent to them in China from Lim Thl in Houston, Texas, had all been placed in a large envelope by the American Consular Officer at Hong Kong and delivered to them for transmission to the immigration authorities at San Francisco. They both testified that the envelope was not opened by them and was delivered to the immigration officials in the same fastened condition in which they received it from the consular officer. That envelope was supposed to contain only the identifying data which they had furnished the American Vice Consul at Hong Kong, and upon the faith of which he had authorized their travel to the United States. Included in the envelope, however, as it was handed to the Chairman of the Board of Special Inquiry at San Francisco, was a highly suspicious letter, hereafter referred to as the Bok Hing letter, which has been the source of most of the trouble caused appellants.

Soon and Min came through their questioning extending over five days very well, except that they professed complete ignorance of the letter addressed to "My son, Bok Hing" and signed "Father, Guey (2nd character illegible) Mother, Choon or Shew (2nd character illegible)." Two English translations of the letter by different interpreters are quoted in the margin.[5]

---

3. Immigration file 34084/1–4 reflected his entry date as 5–16–30.

4. Immigration file 1300–88328 reflects her entry on that date.

5. "My son, Bok Hing:
   "I am sending back from Lee's place two drafts (U.S.) each in the amount of

$50. Interpreter's Note: (At this point there is an insertion to this letter which reads as follows: In these drafts the names Kwock Soon and Kwock Min were used.) This is for you to use as evidence. The money is from me personally, but I have used the names of two persons. When the money arrive make sure that you re-

This letter, the appellee argues, "creates the distinct impression that one of the appellants was actually named Bok Hing, and that the names Lim Kwock Soon and Lim Kwock Min were adopted, and the claimed paternity of Lim Thl a fabrication." Much is made of Soon's behavior when the letter was first discovered, as testified to by Mr. Wilbur D. Cooper who was Chairman of the Board of Special Inquiry.[6] Why that behavior was unusual or suspicious is not clear to us. If Soon observed that the letter did not belong among their identifying documents, the natural and appropriate thing was for him so to indicate.

The envelope contained several other letters written in Chinese characters, some addressed to Soon and some to Min, purportedly sent by Thl and by Lee Yuck Gee. There was no effort to show that the Bok Hing handwriting was the same as any of those letters, and a careful comparison convinces us that it was not, though, of course, we do not profess to be handwriting experts of any kind, much less experts as to Chinese script. The purported date on the letter, "1950.9.11", is found in Arabic numerals only. None of the other letters contain any Arabic numerals. That date is the same as the date of two $50.00 money orders drawn by Lim Thl in favor of Lim Kwock Min and Lim Kwock Soon. The date "1950.-9.11" in Arabic on the letter is in a separate blank space and appellants' counsel argues that it might well have been added to the document at any time. Likewise, the names Kwock Soon and Kwock Min do not appear in the body of the letter, but only in an insertion which appellants' counsel insists might have been made at any time. The letter, though dated 1950.-9.11, was taken from an envelope addressed to Lim Kwock Soon and postmarked "Houston, Texas, July 28, 1950." The envelope contained also a letter admittedly written by Lee Yuck Gee and dated in Chinese script July 28 (no year shown). Printed in large English script at the top left-hand corner of the stationery on which the letter was written are the words "Sky Mail", an expression not ordinarily used in the United States, though the first sentence does refer to "two drafts (U.S.)" or "two American checks", according to different interpretations of the letter.

The Bok Hing letter aroused so much suspicion that at the conclusion of the Board hearing on November 15, 1951, the decision was deferred at the request of Soon and Min until testimony could be taken at Houston, Texas from Thl and from Lee Yuck Gee. On November 23, 1951 Thl and Lee Yuck Gee were ex-

ceive it. This money should have been sent home one week earlier, because the person who were to deliver these checks did not come, I did not have the checks to enclose. It was my intention to combine the two checks into one in the amount of $100. Your father said that if the checks were to serve as evidence it would be more effective to separate the amounts into two copies. Happy schooling.

"Father, Guey (2nd character illegible) Mother, Choon or Shew (2nd character illegible).

"Dated 1950–9–11."

"I am sending from Lee Sin's place two American checks each $50.00 for you to use as evidence. The checks are for the use of the two of you. Please use it when you need it. These funds should have been sent a week earlier, but because the person who delivered the check did not come, so I could not get them.

Previously I would like to send one check for $100.00, but your father said this way is better, so two checks were written. These checks are written in the name of (By Interpreter: I cannot decipher the names, there are two of them). 1950–9–11, and your father, Mow Guey."

6. "Q. Did anything unusual occur at the time that you opened this letter that you wrote, 'To Bok Hing' on? A. Yes. That was what called this letter to my attention. As I was unfolding it and the others to clip them to the envelopes, when the applicant was sitting in the room with me saw it, he made a gesture of disapproval, as if to disregard or throw it out. It shouldn't be there.

"Q. Was he speaking English? A. No English; only a gesture.

"Q. Do you remember if it was Soon or Min? A. I believe it was Kwock Soon."

amined before an Immigration Inspector. They verified their marriage and that Soon and Min were their sons, answered various questions as to family relationship, and identified the letters written by them, but they were unable to shed light on the Bok Hing letter. They swore that they never knew a person by the name of Bok Hing nor any person by either of the names signed to the letter.

On April 25, 1952, Soon and Min were again called before the Board in San Francisco and questioned with much the same results as before. Finally, in July 1952, after being held at San Francisco for more than ten months, Soon and Min were admitted to the United States on bond pending final disposition of their appeal. Having exhausted their administrative remedies, the present action was filed on September 12, 1952.

Upon the trial before the district court, Soon, Min and Thl testified to the same effect as theretofore. Lee Yuck Gee having died was heard only through her deposition taken before the Immigration Inspector. The only evidence offered for the Government was the testimony of Wilbur D. Cooper, Chairman of the Board of Special Inquiry.

As is apparent from its opinion, 143 F.Supp. 388, the main basis for the district court's decision was the doubt generated by the Bok Hing letter.

Assuming that that letter was sufficiently authenticated to authorize its introduction in evidence,[7] we are still most doubtful of its authenticity because of the suspicious and questionable circumstances about that letter itself, many of which have been heretofore recited.

Photostatic copies of six American Express Company money orders are in evidence, each in the sum of $50.00 drawn in three sets of two each, payable respectively to Lim Kwock Soon and Lim Kwock Min. Their dates are 7–3, 1950, 9–11, 1950, and 12–3, 1950. The Government's theory is that the Bok Hing letter referred to the second set dated 9–11, 1950. It offers no explanation of why a letter addressed differently, signed differently, in a different handwriting, and making elaborate explanation of the use of the names Kwock Soon and Kwock Min and of the sending of two checks instead of one should have been thought necessary as to the checks dated 9–11, 1950, when no such explanation was made as to earlier or later checks. None of the envelopes introduced in evidence is addressed to any Bok Hing. It seems most improbable to us that the Bok Hing to whom the controversial letter was addressed was actually one of the appellants.

The questionable Bok Hing letter does not, in our opinion, justify the drastic effects of the decision of the district court on Soon and Min. It may be appropriate to quote here what was said by our Supreme Court as far back as 1920:

"The acts of Congress give great power to the Secretary of Labor over Chinese immigrants and persons of Chinese descent. It is a power to be administered, not arbitrarily and secretly, but fairly and openly, under the restraints of the tradition and principles of free government applicable where the fundamental rights of men are involved, regardless of their origin or race. It is the province of the courts, in proceedings for review, within the limits amply defined in the cases cited, to prevent abuse of this extraordinary power *. *. *. It is better that many Chinese immigrants should be improperly admitted than that one natural born citizen of the United States should be permanently excluded from his country." Kwock Jan Fat v. White, 253 U.S. 454, 464, 40 S.Ct. 566, 570, 64 L.Ed. 1010.

The district court noted also the striking coincidence that Thl, Soon and Min testified as to the birth dates of four members of the family that the month of the year and the day of the month were numerically identical: that is, 8th month,

---

7.   See 7 Wigmore on Evidence, 3d Ed., § 2128 et seq.; 20 Am.Jur., Evidence, § 930.

8th day; 10th month, 10th day; 3rd month, 3rd day; and 2nd month, 2nd day. From this coincidence the court concluded:

"* * * This raises a strong suspicion that the dates were fabricated and that by making the month of the year and the day of the month numerically identical in each case it would be easier for the several witnesses to remember the several dates and avoid conflict in testimony."

We agree that the dates were probably adopted as an aid to memory, but we would not so readily draw the inference of fraud. This criticism is ably answered in the brief of appellants' counsel:

"If we were to concede for the purpose of argument only that members of appellants' family had approximated the dates of birth for ease of memory, which they might have done in a country where no written records of birth were kept and under circumstances wherein they must have foreseen that they would often be thoroughly questioned on all minute details of their lives, then what conclusions should be drawn? Would we deny the parentage or citizenship of our hosts of rural American-born Negroes merely because most of them could not tell us with any degree of accuracy what the actual date of their birth might be? No different standard should be set for our foreign born citizens than for our native born. In light of the great bulk of testimony substantiating the family relationship of the parties concerned the question of their exact dates of birth looms indeed small."

Finally, the Government presents the issue of whether appellants "are the *legitimate* sons of Lim Thl." (Emphasis in appellee's brief.) Thl testified:

"Q. Was there a ceremony performed, or under what rites were you married? A. Married in new

customs in China. I had a marriage certificate, sir.

"Q. Do you have that marriage certificate at this time? A. They have it at the Immigration Office at the time I came.

"Q. You gave it to the Immigration Office? A. I did.

"Q. Then, under Chinese laws and customs you were legally married, is that correct?

"Mr. Farr: I'm going to object to that question as calling for a conclusion of law.

"The Court: The objection is sustained.

* * * * * *

"The Court: He stated he went through some kind of ceremony with a woman. If he did I want him to tell us what it was. Ask him what sort of ceremony was performed. He stated that some kind of ceremony was performed. Will you ask him to explain what it was?

"The Witness: The bride, in what they call these here chairs that they have in China, it's like a little—a carriage—they carry on their shoulders, they carry on poles, two people carry it on poles, on bamboo, and brought the bride to the village, and then she came and stayed with him, stayed with me.

"(By Mr. Reid): Q. Was that a wedding procession you are speaking of? A. Yes, sir."

Laying to one side that there was at least a good common law marriage between Thl and Lim Yuck Gee after she arrived in Texas, and that under Texas law that legitimated the children born of the same father out of wedlock (Article 2581, Revised Civil Statutes of Texas; 6 Tex.Jur. 366–377), the record contains absolutely nothing to cast any suspicion upon the validity of the marriage in China between Thl and Lim Yuck Gee.

"It is one of the strongest presumptions of the law, grounded in public policy favoring and presum-

ing morality, marriage, and legitimacy, that a marriage, once being shown, is presumed to be legal and valid * * *." 35 Am.Jur., Marriage, § 192.

After a careful review of the entire evidence, we are left with the definite and firm conviction that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746. The judgment is therefore reversed and the cause remanded with directions that judgment be rendered declaring that Lim Kwock Soon and Lim Kwock Min, and each of them, are nationals and citizens of the United States. See 28 U.S.C.A. § 2106.

Reversed and remanded with directions.